# United States Court of Appeals
# for the Federal Circuit

---

**ARTHREX, INC.,**
*Appellant*

**v.**

**SMITH & NEPHEW, INC., ARTHROCARE CORP.,**
*Appellees*

**UNITED STATES,**
*Intervenor*

---

2018-2140

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2017-00275.

---

Decided: October 31, 2019

---

ANTHONY P. CHO, Carlson, Gaskey & Olds, PC, Birmingham, MI, argued for appellant. Also represented by DAVID LOUIS ATALLAH, DAVID J. GASKEY, JESSICAE ZILBERBERG.

CHARLES T. STEENBURG, Wolf, Greenfield & Sacks, PC, Boston, MA, argued for appellees. Also represented by RICHARD GIUNTA, TURHAN SARWAR; MICHAEL N. RADER, New York, NY.

MELISSA N. PATTERSON, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, argued for intervenor. Also represented by COURTNEY DIXON, SCOTT R. MCINTOSH, JOSEPH H. HUNT; SARAH E. CRAVEN, THOMAS W. KRAUSE, JOSEPH MATAL, FARHEENA YASMEEN RASHEED, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA.

————————————

Before MOORE, REYNA, and CHEN, *Circuit Judges.*

MOORE, *Circuit Judge.*

Arthrex, Inc. appeals from the final written decision of the Patent Trial and Appeal Board holding claims 1, 4, 8, 10–12, 16, 18, and 25–28 of U.S. Patent No. 9,179,907 unpatentable as anticipated. Arthrex appeals this decision and contends that the appointment of the Board's Administrative Patent Judges ("APJs") by the Secretary of Commerce, as currently set forth in Title 35, violates the Appointments Clause, U.S. Const., art. II, § 2, cl. 2. We agree and conclude that the statute as currently constructed makes the APJs principal officers. To remedy the violation, we follow the approach set forth by the Supreme Court in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010) and followed by the D.C. Circuit in *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (2012). As the Supreme Court instructs, "'[g]enerally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact.'" *Free Enterprise Fund*, 561 U.S. at 508 (quoting *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 328–29 (2006)). We conclude that severing the portion of the Patent Act restricting removal of the APJs is sufficient to render the APJs inferior officers and remedy the constitutional appointment problem. As the final written decision on

appeal issued while there was an Appointments Clause violation, we vacate and remand.  Following *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018), the appropriate course of action is for this case to be remanded to a new panel of APJs to which Arthrex is entitled.

BACKGROUND

Arthrex owns the '907 patent, which is directed to a knotless suture securing assembly.  Smith & Nephew, Inc. and Arthrocare Corp. (collectively "Petitioners" or "Appellees") filed a petition requesting *inter partes* review of claims 1, 4, 8, 10–12, 16, 18, and 25–28 of the '907 patent.

*Inter partes* review is a "'hybrid proceeding' with 'adjudicatory characteristics' similar to court proceedings." *Saint Regis Mohawk Tribe v. Mylan Pharms.*, 896 F.3d 1322, 1326 (Fed. Cir. 2018).  After a petitioner files a petition requesting that the Board consider the patentability of issued patent claims, the Director of the United States Patent and Trademark Office ("USPTO") determines whether to institute an *inter partes* review proceeding.  35 U.S.C. § 314.[1]  A three-judge panel of Board members then conducts the instituted *inter partes* review.  *Id.* § 316(c).[2]  If an

---

[1]    The Director delegated that authority to the Board, so now "[t]he Board institutes the trial on behalf of the Director."  37 C.F.R. § 42.4(a).

[2]    The Board consists of "[t]he Director, the Deputy Director, the Commissioner for Patents, the Commissioner for Trademarks, and the administrative patent judges."  35 U.S.C. § 6(a).  The Director of the USPTO is "appointed by the President, by and with the advice and consent of the Senate."  *Id.* § 3(a).  The Deputy Director and the Commissioners are appointed by the Secretary of Commerce; the former being nominated by the Director.  *Id.* §§ 3(b)(1)–(2).  The Administrative Patent Judges "are appointed by the

instituted review is not dismissed before the conclusion of the proceedings, the Board issues a final written decision determining the patentability of challenged claims. *Id.* § 318(a). Once the time for appeal of the decision expires or any appeal has been terminated, the Director issues and publishes a certificate canceling any claim of the patent finally determined to be unpatentable. *Id.* § 318(b).

The *inter partes* review of the '907 patent was heard by a three-judge panel consisting of three APJs. The Board instituted review and after briefing and trial, the Board issued a final written decision finding the claims unpatentable as anticipated. J.A. 12, 14, 42.

ANALYSIS

A. Waiver

Appellees and the government argue that Arthrex forfeited its Appointments Clause challenge by not raising the issue before the Board. Although "[i]t is the general rule . . . that a federal appellate court does not consider an issue not passed upon below," we have discretion to decide when to deviate from that general rule. *Singleton v. Wulff*, 428 U.S. 106, 120–21 (1976). The Supreme Court has included Appointments Clause objections to officers as a challenge which could be considered on appeal even if not raised below. *Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 878–79 (1991); *Glidden Co. v. Zdanok*, 370 U.S. 530, 535–36 (1962).

In *Freytag*, the Supreme Court exercised its discretion to decide an Appointments Clause challenge despite petitioners' failure to raise a timely objection at trial. 501 U.S. at 878–79. In fact, the Court reached the issue despite the fact that it had not been raised until the appellate stage.

Secretary [of Commerce], in consultation with the Director." *Id.* § 6(a).

The Court explained that the structural and political roots of the separation of powers concept are embedded in the Appointments Clause. It concluded that the case was one of the "rare cases in which we should exercise our discretion to hear petitioners' challenge to the constitutional authority." *Id.* at 879. We believe that this case, like *Freytag*, is one of those exceptional cases that warrants consideration despite Arthrex's failure to raise its Appointments Clause challenge before the Board. Like *Freytag*, this case implicates the important structural interests and separation of powers concerns protected by the Appointments Clause. Separation of powers is "a fundamental constitutional safeguard" and an "exceptionally important" consideration in the context of *inter partes* review proceedings. *Cascades Projection LLC v. Epson America, Inc.*, 864 F.3d 1309, 1322 (Fed. Cir. 2017) (Reyna, J., dissenting from denial of petition for hearing en banc). The issue presented today has a wide-ranging effect on property rights and the nation's economy. Timely resolution is critical to providing certainty to rights holders and competitors alike who rely upon the *inter partes* review scheme to resolve concerns over patent rights.

Appellees and the government argue that like *In re DBC* we should decline to address the Appointments Clause challenge as waived. *DBC* recognized that the court retains discretion to reach issues raised for the first time on appeal, but declined to do so in that case. 545 F.3d 1373, 1380 (Fed. Cir. 2008). The court predicated its decision on the fact that if the issue had been raised before the Board, it could have corrected the Constitutional infirmity because there were Secretary appointed APJs and that Congress had taken "remedial action" redelegating the power of appointment to the Secretary of Commerce in an attempt to "eliminat[e] the issue of unconstitutional appointments going forward." *Id.* at 1380. As the court noted, "the Secretary, acting under the new statute, has reappointed the administrative patent judges involved in DBC's appeal."

*Id.* at 1381. Not only had Congress taken remedial action to address the constitutionality issue, the Secretary had already been implementing those remedies limiting the impact. *Id.* No such remedial action has been taken in this case and the Board could not have corrected the problem. Because the Secretary continues to have the power to appoint APJs and those APJs continue to decide patentability in *inter partes* review, we conclude that it is appropriate for this court to exercise its discretion to decide the Appointments Clause challenge here. This is an issue of exceptional importance, and we conclude it is an appropriate use of our discretion to decide the issue over a challenge of waiver.

## B. Appointments Clause

Arthrex argues that the APJs who presided over this *inter partes* review were not constitutionally appointed. It argues the APJs were principal officers who must be, but were not, appointed by the President with the advice and consent of the Senate.

The Appointments Clause of Article II provides:

[The President] . . . shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. APJs are appointed by the Secretary of Commerce, in consultation with the Director of the USPTO. 35 U.S.C. § 6(a). The issue, therefore, is whether APJs are "Officers of the United States" and if so,

whether they are inferior officers or principal officers; the latter requiring appointment by the President as opposed to the Secretary of Commerce. We hold that in light of the rights and responsibilities in Title 35, APJs are principal officers.

An "Officer of the United States," as opposed to a mere employee, is someone who "exercis[es] significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 125–26 (1976). The Appointments Clause ensures that the individuals in these positions of significant authority are accountable to elected Executive officials. *See Lucia*, 138 S. Ct. at 2056 (Thomas, J., concurring) (citing The Federalist No. 76, p. 455 (C. Rossiter ed. 1961) (A. Hamilton)). It further ensures that the President, and those directly responsible to him, does not delegate his ultimate responsibility and obligation to supervise the actions of the Executive Branch. *See Free Enterprise Fund*, 561 U.S. at 496. The Appointments Clause provides structural protection against the President diffusing his accountability and from Congress dispensing power too freely to the same result. "The structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic." *Freytag*, 501 U.S. at 880. Because "people do not vote for the 'Officers of the United States,'" the public relies on the Appointments Clause to connect their interests to the officers exercising significant executive authority. *Free Enterprise Fund*, 561 U.S. at 497–98. Arthrex argues that the APJs exercise the type of significant authority that renders them Officers of the United States. Neither Appellees nor the government dispute that APJs are officers as opposed to employees. We agree that APJs are Officers of the United States. *See* John F. Duffy, *Are Administrative Patent Judges Constitutional?*, 2007 Patently–O Patent L.J. 21, 25 (2007) (concluding that administrative patent judges are officers as opposed to mere employees).

Under 35 U.S.C. § 6(a), APJs "hold a continuing office established by law . . . to a position created by statute." *Lucia*, 138 S. Ct. at 2053. The APJs exercise significant discretion when carrying out their function of deciding *inter partes* reviews. They oversee discovery, 37 C.F.R. § 42.51, apply the Federal Rules of Evidence, 37 C.F.R. § 42.62(a), and hear oral arguments, 37 C.F.R. § 42.70. And at the close of review proceedings, the APJs issue final written decisions containing fact findings and legal conclusions, and ultimately deciding the patentability of the claims at issue. *See* 35 U.S.C. § 318(a). The government itself has recognized that there is a "functional resemblance between *inter partes* review and litigation," and that the Board uses "trial-type procedures in *inter partes* review." Br. of United States at 26, 31, *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365 (2018). The Board's patentability decisions are final, subject only to rehearing by the Board or appeal to this court. *See* 35 U.S.C. §§ 6(c), 141(c), 319. Like the special trial judges ("STJs") of the Tax Court in *Freytag*, who "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders," 501 U.S. at 881–82, and the SEC Administrative Law Judges in *Lucia*, who have "equivalent duties and powers as STJs in conducting adversarial inquiries," 138 S. Ct. at 2053, the APJs exercise significant authority rendering them Officers of the United States.

The remaining question is whether they are principal or inferior officers. The Supreme Court explained that "[w]hether one is an 'inferior' officer depends on whether he has a superior," and "'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 662–63 (1997). There is no "exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes." *Id.* at 661. However,

the Court in *Edmond* emphasized three factors: (1) whether an appointed official has the power to review and reverse the officers' decision; (2) the level of supervision and oversight an appointed official has over the officers; and (3) the appointed official's power to remove the officers. *See id.* at 664–65; *see also Intercollegiate*, 684 F.3d at 1338. These factors are strong indicators of the level of control and supervision appointed officials have over the officers and their decision-making on behalf of the Executive Branch. The extent of direction or control in that relationship is the central consideration, as opposed to just the relative rank of the officers, because the ultimate concern is "preserv[ing] political accountability." *Edmond*, 520 U.S. at 663. The only two presidentially-appointed officers that provide direction to the USPTO are the Secretary of Commerce and the Director. Neither of those officers individually nor combined exercises sufficient direction and supervision over APJs to render them inferior officers.

## 1. Review Power

The Supreme Court deemed it "significant" whether an appointed official has the power to review an officer's decision such that the officer cannot independently "render a final decision on behalf of the United States." *Edmond*, 520 U.S. at 665. No presidentially-appointed officer has independent statutory authority to review a final written decision by the APJs before the decision issues on behalf of the United States. There are more than 200 APJs and a minimum of three must decide each *inter partes* review. 35 U.S.C. § 6(c). The Director is the only member of the Board who is nominated by the President and confirmed by the Senate. The Director is however only one member of the Board and every *inter partes* review must be decided by at least three Board judges. At the conclusion of the agency proceeding, the Board issues a final written decision. 35 U.S.C. § 318(a).

There is no provision or procedure providing the Director the power to single-handedly review, nullify or reverse a final written decision issued by a panel of APJs. If parties are dissatisfied with the Board decision, they may request rehearing by the Board or may appeal to this court. 35 U.S.C. §§ 6(c), 141(c), 319. "Only the Patent Trial and Appeal Board may grant rehearings," upon a party's request. *Id.* § 6(c). Again, the decision to rehear would be made by a panel of at least three members of the Board. And the rehearing itself would be conducted by a panel of at least three members of the Board.

The government argues that the Director has multiple tools that give him the authority to review decisions issued by APJs. The government argues that the Director possesses the power to intervene and become a party in an appeal following a final written decision with which he disagrees. *See* 35 U.S.C. § 143. But that authority offers no actual reviewability of a decision issued by a panel of APJs. At most, the Director can intervene in a party's appeal and ask this court to vacate the decision, but he has no authority to vacate the decision himself. And the statute only gives the parties to the *inter partes* review the power to appeal the decision, not the Director. *See id.* § 319. If no party appeals the APJs' decision, the Director's hands are tied. "[T]he Director *shall* issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable. . . ." *Id.* § 318(b) (emphasis added). The Director cannot, on his own, *sua sponte* review or vacate a final written decision.

The government argues that the Director has additional review authority through his institution of the recently created Precedential Opinion Panel. That standing panel, composed of at least three Board members, can rehear and reverse any Board decision and can issue decisions that are binding on all future panels of the Board. *See* Patent Trial and Appeal Board Standard Operating Procedure 2 at 8. The Director's authority is limited to

"conven[ing] a Precedential Opinion Panel to review a decision in a case and determine whether to order sua sponte rehearing" and to act as one of the three default members of the panel. *Id.* at 4–5. When the Director sits on a panel as a member of the Board, he is serving as a member of the Board, not supervising the Board.

Additionally, the government points out that the Director "may designate any decision by any panel, including the Precedential Opinion Panel, as precedential . . . ." *Id.* at 8. These powers do not, however, provide the type of reviewability over APJs' decisions comparable to the review power principal officers in other cases have had. *See, e.g.*, *Edmond*, 520 U.S. at 664–65; *Masias v. Secretary of Health and Human Servs.*, 634 F.3d 1283, 1294–95 (Fed. Cir. 2011) (special masters under the Vaccine Act were inferior officers in part because their decisions were "subject to review by the Court of Federal Claims" (an Article I court)). To be clear, the Director does not have the sole authority to review or vacate any decision by a panel of APJs. He can only *convene* a panel of Board members to *decide whether* to rehear a case for the purpose of deciding whether it should be precedential. No other Board member is appointed by the President. The government certainly does not suggest that the Director controls or influences the votes of the other two members of his special rehearing panel. Thus, even if the Director placed himself on the panel to decide whether to rehear the case, the decision to rehear a case and the decision on rehearing would still be decided by a panel, two-thirds of which is not appointed by the President. There is no guarantee that the Director would even be in the majority of that decision. Thus, there is no review by other Executive Branch officers who meet the accountability requirements of the Appointments Clause. Moreover, the Standard Operating Procedure makes clear that the Director would convene such a panel only in cases of "exceptional importance": to potentially set precedent for the Board. In other words, this form of

review—constrained to a limited purpose—is still conducted by a panel of APJs who do not meet the requirements of the Appointments Clause and represents the exception.

Finally, the government alleges that the Director has review authority over Board decisions because he can decide not to institute an *inter partes* review in the first instance. We do not agree that the Director's power to institute (ex ante) is any form of review (ex post). For the past several years, the Board has issued over 500 *inter partes* review final written decisions each year. The relevant question is to what extent those decisions are subject to the Director's review.

The situation here is critically different from the one in *Edmond*. In *Edmond*, the Supreme Court considered whether military judges on the Coast Guard Court of Criminal Appeals were principal as opposed to inferior officers. 520 U.S. at 655. There, the Court of Appeals for the Armed Forces, an Executive Branch entity, had the power to reverse decisions by the military judges and "review[ed] every decision of the Court of Criminal Appeals in which: (a) the sentence extends to death; (b) the Judge Advocate General orders such review; or (c) the court itself grants review upon petition of the accused." *Id.* at 664–65. And while the Judge Advocate General (a properly appointed Executive officer) could not reverse decisions of the military judges, he could order any of those decisions be reviewed by the Court of Appeals for the Armed Forces (a presidentially-appointed Executive Branch, Article I court). *Id.* The Court deemed it "significant [] that the judges of the Court of Criminal Appeals ha[d] *no* power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Id.* at 665 (emphasis added). That is simply not the case here. Panels of APJs issue final decisions on behalf of the USPTO, at times revoking patent rights, without any principal officers having the right to review those decisions. Thus, APJs

have substantial power to issue final decisions on behalf of the United States without any review by a presidentially-appointed officer. We find that there is insufficient review within the agency over APJ panel decisions. This supports a conclusion that APJs are principal officers.

### 2. Supervision Power

The extent to which an officer's work is supervised or overseen by another Executive officer also factors into determining inferior versus principal officer status. *See Edmond*, 520 U.S. at 664. The Director exercises a broad policy-direction and supervisory authority over the APJs. The Director is "responsible for providing policy direction and management supervision" for the USPTO. 35 U.S.C. § 3(a)(2)(A). Arthrex argues the Director's oversight authority amounts to little more than high-level, arms-length control. We disagree.

The Director has the authority to promulgate regulations governing the conduct of *inter partes* review. *Id.* § 316. He also has the power to issue policy directives and management supervision of the Office. *Id.* § 3(a). He may provide instructions that include exemplary applications of patent laws to fact patterns, which the Board can refer to when presented with factually similar cases. Moreover, no decision of the Board can be designated or de-designated as precedential without the Director's approval. Patent Trial and Appeal Board Standard Operating Procedure 2 at 1. And all precedential decisions of the Board are binding on future panels. *Id.* at 11. In addition to these policy controls that guide APJ-panel decision making, the Director has administrative authority that can affect the procedure of individual cases. For example, the Director has the independent authority to decide whether to institute an *inter partes* review based on a filed petition and any corresponding preliminary response. 35 U.S.C. § 314(a). And the Director is authorized to designate the panel of judges who decides each *inter partes* review. *See* 35 U.S.C. § 6(c).

Not only does the Director exercise administrative supervisory authority over the APJs based on his issuance of procedures, he also has authority over the APJs' pay. 35 U.S.C. § 3(b)(6).

The Director's administrative oversight authority is similar to the supervisory authority that was present in both *Edmond* and *Intercollegiate*. In *Edmond*, the Judge Advocate General "exercise[d] administrative oversight" and had the responsibility of "prescrib[ing] uniform rules of procedure" for the military judges. 520 U.S. at 664. Likewise, in *Intercollegiate*, the Librarian of Congress was responsible for approving the Copyright Royalty Judges' ("CRJs") "procedural regulations . . . and [] overseeing various logistical aspects of their duties." 684 F.3d at 1338. And the Register of Copyrights, who was subject to the control of the Librarian, had "the authority to interpret the copyright laws and provide written opinions to the CRJs." *Id.* The Director possesses similar authority to promulgate regulations governing *inter partes* review procedure and to issue policy interpretations which the APJs must follow. Accordingly, we conclude that the Director's supervisory powers weigh in favor of a conclusion that APJs are inferior officers.

### 3. Removal Power

The Supreme Court viewed removal power over an officer as "a powerful tool for control" when it was unlimited. *Edmond*, 520 U.S. at 664. Under the current Title 35 framework, both the Secretary of Commerce and the Director lack unfettered removal authority.

Appellees and the government argue that the Director can remove an APJ based on the authority to designate which members of the Board will sit on any given panel. *See* 35 U.S.C. § 6(c). The government argues that the Director could exclude any APJ from a case who he expects would approach the case in a way inconsistent with his views. The government suggests that the Director could

potentially remove all judicial function of an APJ by refus-ing to assign the APJ to any panel.  The government also claims that the Director could remove an APJ from an *inter partes* review mid-case if he does not want that particular APJ to continue on the case.  Br. of United States at 3, 41.  Section 6(c) gives the Director the power to designate the panel who hears an *inter partes* review, but we note that the statute does not expressly authorize de-designation.  The government argues that because Title 35 authorizes the Director to *designate* members of a panel in an *inter partes* review proceeding, he also has the authority to change the panel composition at any time because "removal authority follows appointment authority."  Oral Arg. 35:52–54; *see also* Br. of United States at 3, 41.  It is correct that when a statute is silent on removal, the power of re-moval is presumptively incident to the power of appoint-ment.  *See In re Hennen*, 38 U.S. 230 (1839); *Myers v. United States*, 272 U.S. 52 (1926).  The government argues by analogy to these cases that the power to de-designate follows the power to designate.  We do not today decide whether the Director in fact has such authority.[3]

---

[3]    It is not clear the Director has de-designation au-thority.  To be sure, *someone* must have the power to re-move an officer from government service, so when a statute is silent about removal, we presume that the person who appoints the officer to office has the power to remove him.  But it is not clear that Congress intended panels once designated to be able to be de-designated.  Such a conclu-sion could run afoul of Congress' goal of speedy resolution through "quick and cost effective alternatives to litiga-tion."  H.R. Rep. No. 112–98, pt. 1, at 48 (2011).  Additional-ly, it is not clear whether this type of mid-case de-designation of an APJ could create a Due Process prob-lem.  However, we need not decide whether the Director

The government analogizes the Director's designation power to the Judge Advocate General's power in *Edmond*, which allowed him to remove a military judge "from his judicial assignment without cause." 520 U.S. at 664. The Director's authority to assign certain APJs to *certain panels* is not the same as the authority to remove an APJ *from judicial service* without cause. Removing an APJ from an *inter partes* review is a form of control, but it is not nearly as powerful as the power to remove from office without cause. "[T]he power to remove officers at will and without cause is a powerful tool for control of an inferior." *Free Enterprise Fund.*, 561 U.S. at 501.

The only actual removal authority the Director or Secretary have over APJs is subject to limitations by Title 5. Title 35 does not provide statutory authority for removal of the APJs. Instead, 35 U.S.C. § 3(c) provides, "[o]fficers and employees of the Office shall be subject to the provisions of title 5, relating to Federal employees." No one disputes that Title 5 creates limitations on the Secretary's or Director's authority to remove an APJ from his or her employment at the USPTO. Specifically, APJs may be removed "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a).[4] This limitation requires "a

---

has such authority or whether such authority would run afoul of the Constitution because even if we accept, for purposes of this appeal, that he does possess that authority, it would not change the outcome.

[4]    The parties dispute which provision of Title 5 governs removal of APJs. Arthrex argues that 5 U.S.C. § 7521(a) limits removal of the APJs to removal "only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board." Whereas the government argues that § 7521 does not apply to APJs because they are

nexus between the misconduct and the work of the agency, *i.e.*, that the employee's misconduct is likely to have an adverse impact on the agency's performance of its functions." *Brown v. Department of the Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000).[5] Moreover, § 7513 provides procedural limitations on the Director's removal authority over APJs. *See, e.g.*, 5 U.S.C. § 7513(b) (entitling the APJ to 30 days advanced written notice stating specific reasons for the proposed removal, an opportunity to answer with documentary evidence, entitlement to representation by an attorney, and a written decision with specific reasons); *Id.* § 7513(d) (right of appeal to the Merit Systems and Protections Board).

The government argues that the Secretary's authority to remove APJs from employment for "such cause as will promote efficiency of the service"—the same standard applied to any other federal employee—underscores that APJs are subject to significant supervision and control. It argues that Title 5's removal restrictions are less cumbersome than the restrictions on the Court of Federal Claims' removal authority over the special masters who were

---

appointed not under 5 U.S.C. § 3105, but under 35 U.S.C. § 6. The government argues therefore that removal of APJs is governed by the section of Title 5 related to federal employees generally, which limits removal "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a). We agree with the government that the applicable provision to removal of APJs in Title 5 is § 7513. Section 7513 contains a lower threshold to support removal than does § 7521.

[5] Under § 7513(b), the Director does not have unfettered authority to remove an APJ from service. We do not, however, express an opinion as to circumstances which could justify a removal for such cause as would promote the efficiency of service.

deemed inferior officers in *Masias*. In *Masias*, we held that special masters authorized by the Vaccine Act were inferior officers. 634 F.3d. at 1295. The special masters were appointed and supervised by judges of the Court of Federal Claims, who are presidentially-appointed. *Id.* at 1294. The special masters could be removed only "for incompetency, misconduct, or neglect of duty or for physical or mental disability or for other good cause shown." *Id.* (quoting 42 U.S.C. § 300aa–12(c)(2)). Though there were significant limits on removal in *Masias*, our court recognized that "decisions issued by the special masters are subject to review by the Court of Federal Claims." *Id.* at 1294. We held that the review power over the special masters' decisions paralleled the review by the Court of Appeals for the Armed forces in *Edmond*, and although the review was not *de novo*, it favored a finding that the special masters were not principal officers. *Id.* at 1295. That significant power of review does not exist with respect to final written decisions issued by the APJs.

The APJs are in many ways similar to the CRJs in *Intercollegiate* for purposes of determining whether an officer is principal or inferior. The CRJs issued ratemaking decisions that set the terms of exchange for musical works. *Intercollegiate*, 684 F.3d at 1338. The APJs issue written decisions determining patentability of patent claims. Both are intellectual property decisions upon which "billions of dollars and the fates of entire industries can ride." *Id.* In *Intercollegiate*, the Librarian approved procedural regulations, issued ethical rules, and oversaw logistical aspects of the CRJs' duties. *Id.* Additionally, the Register of Copyrights provided written opinions interpreting copyright law and could correct any legal errors in the CRJs' decisions. *Id.* at 1338–39. Similarly, the Director has the authority to promulgate regulations governing *inter partes* review and provides written policy directives. He does not, however, have the ability to modify a decision issued by APJs, even to correct legal misstatements. The Director's

inability to review or correct issued decisions by the APJs likens those decisions to "the CRJs' rate determinations [which] are not reversible or correctable by any other officer or entity within the executive branch." *Id.* at 1340. Moreover, the limitations on removal in Title 5 are similar to the limitations on removal in *Intercollegiate*. There, the Librarian could only remove CRJs "for misconduct or neglect of duty." *Id.* at 1340. Here, APJs can only be removed from service for "such cause as will promote the efficiency of the service," meaning for "misconduct [that] is likely to have an adverse impact on the agency's performance of its functions." 5 U.S.C. § 7513; *Brown*, 229 F.3d at 1358. The D.C. Circuit in *Intercollegiate* determined that given the CRJs' nonremovability and the finality of their decisions, "the Librarian's and Register's supervision functions still fall short of the kind that would render [them] inferior officers." 684 F.3d at 1339. Likewise, APJs issue decisions that are final on behalf of the Executive Branch and are not removable without cause. We conclude that the supervision and control over APJs by appointed Executive Branch officials in significant ways mirrors that of the CRJs in *Intercollegiate*.

### 4.  Other Limitations

We do not mean to suggest that the three factors discussed are the only factors to be considered. However, other factors which have favored the conclusion that an officer is an inferior officer are completely absent here. For example, in *Morrison v. Olson*, 487 U.S. 654 (1988), the Court concluded that the Independent Counsel was an inferior officer because he was subject to removal by the Attorney General, performed limited duties, had limited jurisdiction, and had a limited tenure. *Edmond,* 520 U.S. at 661. Unlike the Independent Counsel, the APJs do not have limited tenure, limited duties, or limited jurisdiction.

Interestingly, prior to the 1975 amendment to Title 35, "Examiners-in-Chief"—the former title of the current

APJs—were subject to nomination by the President and confirmation by the Senate. 35 U.S.C. § 3 (1952). In 1975, Congress eliminated their Presidential appointment and instead gave the Secretary of Commerce, upon nomination by the Commissioner, the power to appoint. 35 U.S.C. § 3 (1975). There can be no reasonable dispute that APJs who decide reexaminations, *inter partes* reviews, and post-grant reviews wield significantly more authority than their Examiner-in-Chief predecessors. But the protections ensuring accountability to the President for these decisions on behalf of the Executive Branch clearly lessened in 1975.

Having considered the issues presented, we conclude that APJs are principal officers. The lack of any presidentially-appointed officer who can review, vacate, or correct decisions by the APJs combined with the limited removal power lead us to conclude, like our sister circuit in *Intercollegiate*, which dealt with the similarly situated CRJs, that these are principal officers. While the Director does exercise oversight authority that guides the APJs procedurally and substantively, and even if he has the authority to de-designate an APJ from *inter partes* reviews, we conclude that the control and supervision of the APJs is not sufficient to render them inferior officers. The lack of control over APJ decisions does not allow the President to ensure the laws are faithfully executed because "he cannot oversee the faithfulness of the officers who execute them." *Free Enterprise Fund*, 561 U.S. at 484. These factors, considered together, confirm that APJs are principal officers under Title 35 as currently constituted. As such, they must be appointed by the President and confirmed by the Senate; because they are not, the current structure of the Board violates the Appointments Clause.

## C. Severability

Having determined that the current structure of the Board under Title 35 as constituted is unconstitutional, we must consider whether there is a remedial approach we can

take to address the constitutionality issue. "In exercising our power to review the constitutionality of a statute, we are compelled to act cautiously and refrain from invalidating more of the statute than is necessary." *Helman v. Department of Veterans Affairs*, 856 F.3d 920, 930 (Fed. Cir. 2017) (citing *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984)). Where appropriate, we "try to limit the solution to the problem, [by] severing any problematic portions while leaving the remainder intact." *Free Enterprise Fund*, 561 U.S. at 508. Severing the statute is appropriate if the remainder of the statute is "(1) constitutionally valid, (2) capable of functioning independently, and (3) consistent with Congress' basic objectives in enacting the statute." *United States v. Booker*, 543 U.S. 220, 258–59 (2005).

The government suggests possible remedies to achieve this goal. As to 35 U.S.C. § 3(c)'s requirement that "Officers and employees of the Office shall be subject to the provisions of title 5," the government argues that we could construe Title 5's "efficiency of the service" standard to permit removal in whatever circumstances the Constitution requires. Construing the words "only for such cause as will promote the efficiency of the service" as permitting at-will, without-cause removal is not a plausible construction. *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 841 (1986) ("[a]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . . or judicially rewriting it." (citations omitted)); *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) ("The canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction. In the absence of more than one *plausible* construction, the canon simply has no application." (internal citations omitted)). Moreover, that statutory section pertains to nearly all federal employees. We will not construe 5 U.S.C. § 7513 one way for APJs

and a different way for everyone else to which it applies. The government next argues that we could construe the statute as providing the Director the authority to unilaterally revise a Board decision before it becomes final. We see no language in the statute that could plausibly be so construed. The statute is clear that Board decisions must be rendered by at least three Board judges and that only the Board can grant rehearing. 35 U.S.C. § 6(c) ("Each appeal, derivation proceeding, post-grant review, and inter partes review shall be heard by at least 3 members of the Patent Trial and Appeal Board, who shall be designated by the Director. Only the Patent Trial and Appeal Board may grant rehearings."). Indeed, the government recommends in the alternative that we simply sever the "three-member clause."

Allowing the Director to appoint a single Board member to hear or rehear any *inter partes* review (appeal, derivation proceeding, and post grant review), especially when that Board member could be the Director himself, would cure the Constitutional infirmity. While the Board members would still not be subject to at-will removal, their decision would not be the "final decision on behalf of the United States unless permitted to do so by other Executive officers." *Edmond*, 520 U.S. at 665. This combined with the other forms of supervision and controlled exercised over APJs would be sufficient to render them inferior officers. We conclude, however, that severing three judge review from the statute would be a significant diminution in the procedural protections afforded to patent owners and we do not believe that Congress would have created such a system. Eliminating three-APJ panels from all Board proceedings would be a radical statutory change to the process long required by Congress in all types of Board proceedings. The current three-judge review system provides a broader collection of technical expertise and experience on each panel addressing *inter partes* reviews, which implicate wide cross-sections of technologies. The breadth of

backgrounds and the implicit checks and balances within each three-judge panel contribute to the public confidence by providing more consistent and higher quality final written decisions.[6] We are uncomfortable with such a sweeping change to the statute at our hands and uncertain that Congress would have been willing to adopt such a change. And, importantly, we see a far less disruptive alternative to the scheme Congress laid out.

The government also suggested partially severing 35 U.S.C. § 3(c), the provision that applies Title 5 to officers and employees of the USPTO. Br. of United States at 35 ("Alternatively, this Court could hold that 35 U.S.C. § 3(c)'s provision that USPTO officers and employees are subject to Title 5 cannot constitutionally be applied to Board members with respect to that Title's removal restrictions, and thus must be severed to that extent."). We think this the

---

[6] In 2015, the USPTO requested comments on a proposed pilot program under which institution decisions for *inter partes* reviews would be decided by a single APJ as opposed to three-APJ panels. Multiple commenters expressed concern that such a change would reduce consistency, predictability, and accuracy in the institution decisions. *See, e.g.*, Comments of the American Bar Association Section of Intellectual Property at 3 (Nov. 12, 2015) ("a single judge panel . . . will increase the likelihood of incorrect decisions); Comments of Various Automotive Companies at 3 (Nov. 17, 2015) ("Using just one APJ to decide a particular matter would greatly dilute . . . deliberativeness."); Comments of Askeladden LLC at 2 (Nov. 18, 2015) ("the inherent safeguard of a three-judge arbiter gives the public confidence"); Comments of Public Knowledge and Electronic Frontier Foundation at 2 (Nov. 18, 2015) ("by changing the institution decision body from a three-judge panel to a single judge, the USPTO risks a decline in quality of institution decisions").

narrowest viable approach to remedying the violation of the Appointments Clause. We follow the Supreme Court's approach in *Free Enterprise Fund*, similarly followed by the D.C. Circuit in *Intercollegiate*. *See* 561 U.S. 477; 684 F.3d 1332. In *Free Enterprise Fund*, the Supreme Court held that a "for-cause" restriction on the removal power of the SEC's Commissioners violated the Constitution. *Id.* at 492. The Court invalidated and severed the problematic "for-cause" restriction from the statue rather than holding the larger structure of the Public Company Accounting Oversight Board unconstitutional. *Id.* at 508.

The D.C. Circuit followed this approach in *Intercollegiate*, by invalidating and severing the restriction on the Librarian's removal power over CRJs. 684 F.3d at 1340. The court held unconstitutional all language in the relevant removal statute other than, "[t]he Librarian of Congress may sanction or remove a Copyright Royalty Judge." *Id.* The Court determined that giving the Librarian of Congress unfettered removal power was sufficient such "that the CRJs' decisions will be constrained to a significant degree by a principal officer (the Librarian)." *Id.* at 1341. And the constraint of that power was enough to render the CRJs inferior officers. *Id.*

Severing Title 5's removal restrictions might arguably be achieved either by severing the words "Officers and" or by concluding that those removal restrictions are unconstitutional as applied to APJs. The government recommends a partial invalidation, namely that we sever the application of Title 5's removal restrictions to APJs. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995); *United States v. Grace*, 461 U.S. 171 (1983). All parties and the government agree that this would be an appropriate cure for an Appointments Clause infirmity. This as-applied severance is the narrowest possible modification to the scheme Congress created and cures the constitutional violation in the same manner as *Free Enterprise Fund* and

*Intercollegiate*. Title 5's removal protections cannot be constitutionally applied to APJs, so we sever that application of the statute.

Severability turns on whether "the statute will function in a manner consistent with the intent of Congress." *Alaska Airlines, Inc.* v. *Brock*, 480 U.S. 678, 685 (1987) (emphasis omitted). In *Free Enterprise Fund*, the Court severed the removal provision because it concluded that "nothing in the statute's text or historical context" suggested that Congress "would have preferred no Board at all to a Board whose members are removable at will." 561 U.S. at 509. Indeed, we answer affirmatively the question: "Would the legislature have preferred what is left of its statute to no statute at all?" *Ayotte*, 546 U.S. at 330. It is our view that Congress intended for the *inter partes* review system to function to review issued patents and that it would have preferred a Board whose members are removable at will rather than no Board at all.

The narrowest remedy here is similar to the one adopted in *Intercollegiate*, the facts of which parallel this case. Thus, we conclude that the appropriate remedy to the constitutional violation is partial invalidation of the statutory limitations on the removal of APJs. Title 35 U.S.C. § 3(c) declares the applicability of Title 5 rights to "Officers and employees of the Office." *See also* Supp. Br. of United States at 9–10 (noting that Title 5 definitions might cover APJs). Title 5 U.S.C. § 7513(a) permits agency action against those officers and employees "only for such cause as will promote the efficiency of the service." Accordingly, we hold unconstitutional the statutory removal provisions as applied to APJs, and sever that application. Like the D.C. Circuit in *Intercollegiate*, we believe severing the restriction on removal of APJs renders them inferior rather than principal officers. Although the Director still does not have independent authority to review decisions rendered by APJs, his provision of policy and regulation to guide the outcomes of those decisions, coupled with the power of

removal by the Secretary without cause provides significant constraint on issued decisions.

The decision to partially invalidate statutory removal protections limits the effect of the severance to APJs and to their removal protections. We are mindful that the alternative of severing the "Officers and" provision from § 3(c) may not have been limited to APJs (there might have been other officers whose Title 5 rights would have been affected) and it might have removed all Title 5 protections, not just removal protections. Severing the application to APJs of removal protections is the narrowest remedy. The choice to sever and excise a portion of a statute as unconstitutional in order to preserve the statute as a whole is limited, and does not permit judicial rewriting of statutes. *Booker*, 543 U.S. at 258 (to address the constitutional infirmity, we consider "*which* portions of the . . . statute we must sever and excise as inconsistent with the Court's constitutional requirement"); *Ayotte*, 546 U.S. at 329 ("[W]e restrain ourselves from 'rewrit[ing] . . . law to conform it to constitutional requirements' even as we strive to salvage it"). "'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.'" *Buckley*, 424 U.S. at 108–09 (quoting *Champlin Refining Co. v. Corporation Comm'n of Oklahoma*, 286 U.S. 210, 234 (1932)). We are not, under the guise of severability, permitted to add exceptions for APJs to the language § 3(c) officer protections. *Railroad Retirement Bd. v. Alton R. Co.*, 295 U.S. 330, 362 (1935) (when severing a statute, we must avoid "rewrit[ing] a statute"). We hold that the application of Title 5's removal protections to APJs is unconstitutional and must be severed. And we are convinced that Congress would preserve the statutory scheme it created for reviewing patent grants and that it intended for APJs to be inferior officers. Our severance of the limits on removal of APJs achieves this. We believe that this, the

narrowest revision to the scheme intended by Congress for reconsideration of patent rights, is the proper course of action and the action Congress would have undertaken.

Because the Board's decision in this case was made by a panel of APJs that were not constitutionally appointed at the time the decision was rendered, we vacate and remand the Board's decision without reaching the merits. The government argues that while this court has the discretion to vacate and remand in the event there is an Appointments Clause challenge, we should decline to do so because the challenge was not first brought before the Board. The government argues that Arthrex's challenge was not timely and as such we should decline to award the relief *Lucia* deems appropriate. Arthrex argues it would have been futile to raise the Appointments Clause challenge before the Board because the Board lacked the authority to grant it relief. Arthrex argues it raised the challenge at the first stage where it could have obtained relief and therefore its argument is timely. We agree with Arthrex that the Board was not capable of providing any meaningful relief to this type of Constitutional challenge and it would therefore have been futile for Arthrex to have made the challenge there. "An administrative agency may not invalidate the statute from which it derives its existence and that it is charged with implementing." *Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 673 (6th Cir. 2018) (citing *Mathews v. Diaz*, 426 U.S. 67, 76 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975); *Johnson v. Robison*, 415 U.S. 361, 368 (1974); *PUC v. United States*, 355 U.S. 534, 539-40 (1958)). The PTAB itself has declined to examine this issue in other cases. *See Samsung Elecs. Am., Inc. v. Uniloc*, 2017 LLC, No. IPR2018-01653, 2019 WL 343814, at *2 (PTAB Jan. 25, 2019) (declining to consider constitutional challenge to appointments because "administrative agencies do not have jurisdiction to decide the constitutionality of congressional enactments" and "[t]his is especially true when, as here, the constitutional claim asks the agency to act contrary to

its statutory charter") (internal citations and quotation marks omitted); *see also Intel Corp. v VLSI Tech. LLC*, No. IPR2018-01107, 2019 PAT. APP. LEXIS 4893, at *26-27 (P.T.A.B. Feb. 12, 2019); *Unified Patents Inc. v. MOAEC Techs., LLC*, No. IPR2018-01758, 2019 WL 1752807, at *9 (P.T.A.B. Apr. 17, 2019). The only possibility of correction which the government claims the agency could have made is the Director shutting down the IPR regime by refusing to institute. Petitioners argue that if the Appointments Clause challenge had been raised at the Board, it "could have prompted the PTAB to defer institution decisions on all IPRs" and "[t]he Executive Branch could have then championed legislation to address the alleged constitutional infirmity." Arthrex sought to have its case decided by a constitutionally appointed board. The PTO could not provide this relief.

We agree with Arthrex that its Appointments Clause challenge was properly and timely raised before the first body capable of providing it with the relief sought—a determination that the Board judges are not constitutionally appointed. Our decision in *DBC* is not to the contrary. In *DBC,* the Appointments Clause challenge was to the particular APJs who were appointed by the Director, rather than the Secretary. We observed that if the issue had been raised before the agency, the agency could have "corrected the constitutional infirmity." *DBC*, 545 F.3d at 1379. At that time, there were APJs who had been appointed by the Secretary who could have decided the case and thus the agency could have cured the constitutional defect. In *DBC,* we observed that in *LA Tucker* and *Woodford*, had the issue been raised at the agency, the agency could have corrected the problem. *See id.* at 1378 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006); *United States v. LA Tucker Truck Lines*, 344 U.S. 33 (1952)). *Ryder v. United States*, cited by the government, likewise involved a challenge made to a particular judge, and the problem could have been cured by reassigning the case to a different judge at the trial level.

515 U.S. 177 (1995). In contrast, here the Director is the only Presidentially-appointed, Senate confirmed member of the Board. The Board was not capable of correcting the constitutional infirmity. We conclude that this Constitutional challenge is one in which the Board had no authority to provide any meaningful relief and that it was thus futile for Arthrex to have raise the challenge before the Board.

The *Lucia* court explained that Appointments Clause remedies are designed to advance structural purposes of the Appointments Clause and to incentivize Appointments Clause challenges. *Lucia,* 138 S. Ct. at 2055 n.5. We conclude that both of these justifications support our decision today to vacate and remand. *See Collins v. Mnuchin*, 938 F.3d 553, 593 (5th Cir. 2019) (recognizing, "the Court has invalidated actions taken by individuals who were not properly appointed under the Constitution."). The Supreme Court held in *Freytag* that Appointments Clause challenges raise important structural interests and separation of powers concerns. We conclude that challenges under these circumstances should be incentivized at the appellate level and accordingly the remedy provided is appropriate. We have decided only that this case, where the final decision was rendered by a panel of APJs who were not constitutionally appointed and where the parties presented an Appointments Clause challenge on appeal, must be vacated and remanded. Appointments Clause challenges are "nonjurisdictional structural constitutional objections" that can be waived when not presented. *Freytag*, 501 U.S. at 878–79. Thus, we see the impact of this case as limited to those cases where final written decisions were issued and where litigants present an Appointments Clause challenge on appeal.

Finally, on remand we hold that a new panel of APJs must be designated and a new hearing granted. *See* Appellant's Supp. Br. at 12 ("This Court should thus order a remand to a new PTAB panel for a new oral argument.") The Supreme Court has explained that when a judge has heard

the case and issued a decision on the merits, "[h]e cannot be expected to consider the matter as though he had not adjudicated it before.  To cure the constitutional error, another ALJ . . . must hold the new hearing."  *Lucia*, 138 S. Ct. at 2055.  *Lucia* suggests that the remedy is not to vacate and remand for the same Board judges to rubber-stamp their earlier unconstitutionally rendered decision.  Like *Lucia*, we hold that a new panel of APJs must be designated to hear the *inter partes* review anew on remand.  To be clear, on remand the decision to institute is not suspect; we see no constitutional infirmity in the institution decision as the statute clearly bestows such authority on the Director pursuant to 35 U.S.C. § 314.  Finally, we see no error in the new panel proceeding on the existing written record but leave to the Board's sound discretion whether it should allow additional briefing or reopen the record in any individual case.

## VACATED AND REMANDED

### COSTS

The parties shall bear their own costs.