# United States Court of Appeals for the Federal Circuit

---

**ARTHREX, INC.,**
*Appellant*

**v.**

**SMITH & NEPHEW, INC., ARTHROCARE CORP.,**
*Appellees*

**UNITED STATES,**
*Intervenor*

---

2018-2140

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2017-00275.

---

## ON PETITIONS FOR REHEARING EN BANC

---

ANTHONY P. CHO, Carlson, Gaskey & Olds, PC, Birmingham, MI, for appellant. Also represented by DAVID LOUIS ATALLAH, DAVID J. GASKEY, JESSICA E. FLEETHAM; TREVOR ARNOLD, JOHN W. SCHMIEDING, Arthrex, Inc., Naples, FL; ROBERT KRY, JEFFREY A. LAMKEN, MoloLamken LLP, Washington, DC.

CHARLES T. STEENBURG, Wolf, Greenfield & Sacks, PC, Boston, MA, for appellees. Also represented by RICHARD

2                 ARTHREX, INC. v. SMITH & NEPHEW, INC.

GIUNTA, TURHAN SARWAR, NATHAN R. SPEED; MICHAEL N. RADER, New York, NY; MARK J. GORMAN, Smith & Nephew, Inc., Cordova, TN; MARK ANDREW PERRY, Gibson, Dunn & Crutcher LLP, Washington, DC.

   MELISSA N. PATTERSON, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, for intervenor.  Also represented by COURTNEY DIXON, SCOTT R. MCINTOSH, JOSEPH H. HUNT; SARAH E. CRAVEN, THOMAS W. KRAUSE, JOSEPH MATAL, FARHEENA YASMEEN RASHEED, DANIEL KAZHDAN, NICHOLAS THEODORE MATICH, IV, MOLLY R. SILFEN, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA.

   CHARLES R. MACEDO, Amster Rothstein & Ebenstein LLP, New York, NY, for amicus curiae New York Intellectual Property Law Association.  Also represented by DAVID P. GOLDBERG; ROBERT M. ISACKSON, Leason Ellis LLP, White Plains, NY; ROBERT JOSEPH RANDO, The Rando Law Firm P.C., Syosset, NY; KSENIA TAKHISTOVA, East Brunswick, NJ.

   MATTHEW S. HELLMAN, Jenner & Block LLP, Washington, DC, for amicus curiae The Association of Accessible Medicines.  Also represented by YUSUF ESAT, Chicago, IL; JEFFREY FRANCER, The Association for Accessible Medicines, Washington, DC.

---

Before PROST, *Chief Judge*, NEWMAN, LOURIE, DYK, MOORE, O'MALLEY, REYNA, WALLACH, TARANTO, CHEN, HUGHES, and STOLL, *Circuit Judges*.

MOORE, *Circuit Judge*, with whom O'MALLEY, REYNA, and CHEN, *Circuit Judges*, join, concurs in the denial of the petitions for rehearing en banc.

O'MALLEY, *Circuit Judge*, with whom MOORE and REYNA, *Circuit Judges*, join, concurs in the denial of the petitions for rehearing en banc.

DYK, *Circuit Judge*, with whom NEWMAN and WALLACH, *Circuit Judges* join, and with whom HUGHES, *Circuit Judge*, joins as to Part I.A, dissents from the denial of the petitions for rehearing en banc.

HUGHES, *Circuit Judge*, with whom WALLACH, *Circuit Judge*, joins, dissents from the denial of the petitions for rehearing en banc.

WALLACH, *Circuit Judge*, dissents from the denial of the petitions for rehearing en banc.

PER CURIAM.

# ORDER

Petitions for rehearing en banc were filed by appellant Arthrex, Inc.; appellees Smith & Nephew, Inc. and Arthrocare Corp.; and intervenor United States.  Responses to the petitions were invited by the court and filed by all three parties.  Two motions for leave to file amici curiae briefs were filed and granted by the court.  The petitions for rehearing, responses, and amici curiae briefs were first referred to the panel that heard the appeals, and thereafter to the circuit judges who are in regular active service.  A poll was requested, taken, and failed.

Upon consideration thereof,

IT IS ORDERED THAT:

1)  The petitions for panel rehearing are denied.

2)  The petitions for rehearing en banc are denied.

4                          ARTHREX, INC. v. SMITH & NEPHEW, INC.


    3)  The mandate of the court will issue on March 30, 2020.

FOR THE COURT


March 23, 2020                    /s/ Peter R. Marksteiner
      Date                        Peter R. Marksteiner
                       Clerk of Court

# United States Court of Appeals for the Federal Circuit

_____

**ARTHREX, INC.,**
*Appellant*

**v.**

**SMITH & NEPHEW, INC., ARTHROCARE CORP.,**
*Appellees*

**UNITED STATES,**
*Intervenor*

_____

2018-2140

_____

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2017-00275.

_____

MOORE, *Circuit Judge*, with whom O'MALLEY, REYNA, and CHEN, *Circuit Judges*, join, concurring in the denial of the petitions for rehearing *en banc*.

I concur in the court's decision to deny the petitions for rehearing *en banc* as rehearing would only create unnecessary uncertainty and disruption. The *Arthrex* panel followed Supreme Court precedent to conclude that the administrative patent judges (APJs) of the USPTO's Patent Trial and Appeal Board were improperly appointed principal officers. It further followed the Supreme Court's direction by severing a portion of the statute to solve that

constitutional problem while preserving the remainder of the statute and minimizing disruption to the *inter partes* review system Congress created. The panel's curative severance and subsequent decisions from this court have limited the now constitutionally composed Board's burden of addressing cases on remand. I see no merit to the alternative courses laid out by the dissents. I agree with the government that we are not free to affirm despite the constitutional infirmity. Finally, I do not agree with Judge Dyk that we ought to propose a USPTO restructuring of our making and stay all proceedings (presumably this and other *inter partes* review appeals) while both Congress and the USPTO consider Judge Dyk's legislative proposal. If Congress prefers an alternate solution to that adopted by this court, it is free to legislate, and in the meantime, the Board's APJs are constitutionally appointed and *inter partes* reviews may proceed according to Congress' initial intent.

I

In *Arthrex,* the court followed Supreme Court precedent in reaching its conclusion that APJs were principal officers who were not constitutionally appointed. The Supreme Court explained that, while there is no "exclusive criterion for distinguishing between principal and inferior officers . . . 'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 661–63 (1997). *Arthrex* recognized *Edmond*'s broad framework as well as factors the Supreme Court considers when addressing an Appointments Clause issue. *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320, 1329–30 (Fed. Cir. 2019). After weighing those factors and considering the relationship between the Presidentially-appointed Director of the USPTO and the Board's APJs, the panel held that APJs were principal officers who must be

Presidentially appointed to comport with the Constitution's Appointments Clause. *Id.* at 1335.

As the *Arthrex* panel explained, the Director has some authority over conducting the *inter partes* review process—such as institution decisions and panel composition—and may issue guidance or designate decisions as precedential for future panels of APJs. *Id.* at 1329–32. But the Director lacks the authority to independently alter a panel's final written decision, and he lacks sufficient control over the panel's decision before it issues on behalf of the Executive. *Id.* at 1335. APJs had the authority to "render a final decision on behalf of the United States." *Edmond*, 520 U.S. at 663, 665. The panel also recognized that the Director lacked the "powerful tool for control" that is the authority to remove APJs "at will and without cause." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 501 (2010).[1] The *Arthrex* decision followed Supreme Court precedent and was consistent with analyses of other circuits addressing Appointments Clause questions. *See, e.g.*, *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1342 (D.C. Cir. 2012); *Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 679 (6th Cir. 2018).

## II

When an officer's appointment violates the Appointments Clause, courts "try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Free Enter. Fund*, 561 U.S. at 508. As the Supreme Court explained, "we must retain those portions of the Act that are (1) constitutionally valid, (2) capable of functioning independently, and (3) consistent with Congress' basic objectives in enacting the statute." *United*

---

[1]    To the extent that the dissents suggest otherwise, it is the Secretary of Commerce, not the Director, who appoints (35 U.S.C. § 6(c)) and thus can remove APJs.

4                    ARTHREX, INC. v. SMITH & NEPHEW, INC.

*States v. Booker*, 543 U.S. 220, 258–59 (2005) (internal citations omitted). The *Arthrex* decision adopted the severance proposed by the USPTO, which would cause the least disruption while preserving the *inter partes* review scheme Congress intended. *Arthrex*, 941 F.3d at 1337–38.

Severing APJ removal protections gives properly appointed officers sufficient direction and supervision over APJ decision-making to render them inferior officers. The curative severance was consistent with the Supreme Court's approach to a separation of powers violation in *Free Enterprise Fund*. 561 U.S. at 508 (severing a "for-cause" removal restriction as unconstitutional). It similarly aligned with the D.C. Circuit's approach in *Intercollegiate*, which severed a removal restriction to rectify an Appointments Clause violation. 684 F.3d at 1340–41.

While there may have been other possible curative severances, the *Arthrex* severance, which the USPTO itself proposed, was consistent with Congress' intent in enacting the *inter partes* review system. Although Congress originally intended that APJs have removal protections, that was not Congress' central objective when it created the USPTO's *inter partes* review system. The "basic purpose" of the *inter partes* review proceeding is "to reexamine an earlier agency decision." *Cuozzo Speed Techs. LLC v. Lee*, 136 S. Ct. 2131, 2144 (2016) ("[T]he proceeding offers a second look at an earlier administrative grant of a patent."); *see, e.g.*, 157 Cong. Rec. S1326 (March 7, 2011) (Sen. Sessions) ("This will allow invalid patents that were mistakenly issued by the PTO to be fixed early in their life, before they disrupt an entire industry or result in expensive litigation."). *Arthrex*'s severance properly retained the portions of the statute necessary to effectuate Congress' basic objective of providing an agency mechanism where the validity of issued patents may be challenged. Congress "would have preferred a Board whose members are removable at will rather than no Board at all." *Arthrex*, 941 F.3d at 1337–38; *see Ayotte v. Planned Parenthood of N. New*

*England*, 546 U.S. 320, 330 (2006) ("After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute or no statute at all?").[2]   So too does the USPTO, which proposed the severance that *Arthrex* adopted to preserve the system in lieu of the entire thing being struck down as unconstitutional.

The *Arthrex* panel's severance was the "narrowest possible modification to the scheme Congress created" and the approach that minimized the disruption to the continuing operation of the *inter partes* review system. *Arthrex*, 941 F.3d at 1337. Because the APJs were constitutionally appointed as of the implementation of the severance, *inter partes* review decisions going forward were no longer rendered by unconstitutional panels. Additionally, subsequent decisions issued by this court significantly limited the number of appeals that needed to be remanded based on Appointments Clause challenges raised on appeal. *See Customedia Techs., LLC v. Dish Network Corp.*, 941 F.3d 1174, 1175 (Fed. Cir. 2019) (holding that Appointments Clause challenges not raised prior to or in the appellant's opening brief are waived). The window for appeals from Board decisions issued prior to October 31, 2019—the date *Arthrex* issued—has closed. And no more than 81 appeals including *Arthrex* itself can be vacated and remanded[3]

---

[2]   Judge Hughes suggests that Congress would not have divested APJs of their removal protection to preserve the remainder of the statute and that Congress should fix the statute. To be clear, this would require holding the *inter partes* review statute unconstitutional and paralyzing the Board until Congress acts.

[3]   Per the Supreme Court's decision in *Lucia*, *Arthrex*, and the other appeals with preserved Appointments Clause challenges, were vacated and remanded for

6                    ARTHREX, INC. v. SMITH & NEPHEW, INC.

based on preserved Appointments Clause violations.[4]  The
Board decides on average 820 cases each month (39 *inter
partes* reviews and 781 ex parte appeals).[5]   The *Arthrex*

---

hearings before new panels of APJs, who are now properly
appointed.  *Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018)
("[T]he 'appropriate' remedy for an adjudication tainted
with an appointments violation is a new 'hearing before a
properly appointed' official."); *see Intercollegiate*, 684 F.3d
at 1342; *Jones Bros.*, 898 F.3d at 679.  *Harper v. Virginia
Dep't of Taxation* does not establish that an applied sever-
ance, which preserves an otherwise unconstitutional stat-
ute, applies retroactively.  509 U.S. 86 (1993).  The panel
of APJs that decided the *inter partes* review in this case
was not constitutionally appointed when it rendered that
decision.  To forgo vacatur as Judge Dyk suggests would be
in direct contrast with *Lucia* and would undermine any in-
centive a party may have to raise an Appointments Clause
challenge.  The USPTO briefed this issue and likewise re-
jects the argument that *Harper* creates a basis for affirm-
ing.  Supp. Br. of United States, *Polaris v. Kingston*, Nos.
2018-1768, -1831, at 14.

    [4]    We have thus far vacated and remanded 37 appeals
which properly preserved the Appointments Clause chal-
lenge by raising it before or in their opening brief.  There
are 44 Board decisions rendered prior to our curative deci-
sion (October 31, 2019) where a notice of appeal has been
filed by the patent owner, but no opening brief as of yet, or
where an opening brief has been filed and does raise an
Appointments Clause challenge.  Thus, the universe of
cases which could be vacated and remanded (if every one of
these appellants requests remand) is 81.

    [5]    *See*    https://www.uspto.gov/patents-application-
process/patent-trial-and-appeal-board/appeals-and-inter-
ferences-statistics-page (to ascertain ex parte stats); *see*
https://www.uspto.gov/patents-application-process/patent-

decision will result in at most 81 remands. And the remands are narrow in scope and will not necessitate anything like a full-blown process. *Arthrex,* 941 F.3d at 1340 (holding that the USPTO is not required to reopen the record or permit new briefing).

The severance applied in *Arthrex* resulted in minimal disruption to the *inter partes* review system and no uncertainty presently remains as to the constitutionality of APJ appointments. Rehearing this case *en banc* would have unraveled an effective cure and created additional disruption by increasing the potential number of cases that would require reconsideration on remand. Judge Dyk's suggestion that *Arthrex* be stayed to allow Congress to legislate a cure makes little sense. Staying the case, and any other pending appeal that challenges the Appointments Clause, would result in an unnecessary backlog of cases pending a congressional cure that is not guaranteed. And even if Congress did codify a new *inter partes* review scheme, those stayed cases would still need to be reprocessed on remand under the new scheme.

Nothing in the *Arthrex* decision prevents Congress from legislating to provide an alternative fix to the Appointments Clause issue. Congress can reinstate title 5 removal protections for APJs while ensuring that the *inter partes* review system complies with the Appointments Clause, if it so chooses.

III

There are several problems with the creative approach suggested in Judge Dyk's dissent. The dissent proposes that we stay this (and possibly other *inter partes* review appeals) while Congress or the USPTO considers an agency restructuring of his proposal. I am not convinced that it

---

trial-and-appeal-board/statistics/aia-trial-statistics-archive (to ascertain *inter parte* review stats).

would be appropriate or wise to issue such stays.  Curing the constitutional defect had immediate and significant benefits.  And there is a significant difference between a court's election to sever a statutory provision as unconstitutional and issuing legislative or regulatory advisory mandates.  The Constitution does not provide us authority to legislate, and, "mindful that our constitutional mandate and institutional competence are limited," we should refrain from proposing legislative or regulatory fixes.  *Ayotte*, 546 U.S. at 329.  The dissent goes far afield by proposing an entirely new agency framework for review for Congress to adopt.  Dissent at 9–14 (Dyk, J., dissenting).  We should not attempt to correct a separation of powers issue by creating one of our own.

Finally, Judge Dyk's proposed fix has not been reviewed and should not be presumed to pass constitutional muster.[6]  The dissent suggests that a reconsideration panel comprising the Director, Deputy Director, and Commissioner of Patents would suffice.  *Id.* at 9–12.  But it is not clear, as Judge Dyk suggests, that the Director has the authority to remove either the Deputy Director or the Commissioner of Patents without cause.  Section 3(b)(2)(C) limits the Secretary of Commerce's ability to remove the Commissioner of Patents to situations of "misconduct or nonsatisfactory performance . . . ."  35 U.S.C. § 3(b)(2)(C).  And § 3(c) may afford the Deputy Director removal

---

[6]    Even if the USPTO were to adopt the dissent's proposed framework, *Arthrex* and all other similarly situated cases would still need to be vacated and remanded to the Board.  The new framework did not exist when *Arthrex* was decided and it would not rectify the constitutional infirmity retroactively.

protections under title 5.[7]  For the reasons given, I do not believe it proper or prudent to stay cases while Congress considers Judge Dyk's restructuring of the USPTO.

## IV

The *Arthrex* panel followed Supreme Court precedent in reaching its decision.  The severance provided has minimized disruption and preserved Congress' intent as best possible while ensuring that the Constitution's structural protections are minded.  Given that the *Arthrex* decision is squarely rooted in Supreme Court precedent, I agree with the court's denial of rehearing *en banc*.  If the curative severance adopted by this court is not consistent with Congress' intent, Congress can legislate to restore the removal protections and adopt a different curative mechanism.

---

[7]   Section 3(c) expressly says that title 5 protections apply to the agency's "officers and employees" of which the Deputy Director is undeniably one.  Moreover, in other sections of the same statute when Congress intended to exempt an officer from title 5 protections it stated so explicitly.  *See, e.g.*, 35 U.S.C. § 3(b)(2)(C) ("[T]he Commissioners may be removed from office by the Secretary . . . without regard to the provisions of title 5 . . .").

# United States Court of Appeals
# for the Federal Circuit

_____

**ARTHREX, INC.,**
*Appellant*

**v.**

**SMITH & NEPHEW, INC., ARTHROCARE CORP.,**
*Appellees*

**UNITED STATES,**
*Intervenor*

_____

2018-2140

_____

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2017-00275.

_____

O'MALLEY, *Circuit Judge*, with whom MOORE and REYNA, *Circuit Judges*, join, concurring in the denial of the petitions for rehearing en banc.

I join Judge Moore's concurrence in full. I agree that the panel correctly concluded that, under the Supreme Court's Appointments Clause jurisprudence, Administrative Patent Judges ("APJs") are principal officers who were not properly appointed to their adjudicative positions. I also agree that, rather than invalidate the entirety of the America Invents Act ("AIA"), Congress would prefer to preserve the patent review scheme it created under that Act.

In severing from the AIA the application of the removal restrictions in 5 U.S.C. § 7513 ("Title 5") to APJs, the panel hewed closely to the principles guiding judicial severance: refraining from rewriting the statute or invalidating more of it than was absolutely necessary. *See R.R. Ret. Bd. v. Alton R.R. Co.*, 295 U.S. 330, 362 (1935); *Helman v. Dep't of Veterans Affairs*, 856 F.3d 920, 930 (Fed. Cir. 2017). While I agree with Judge Dyk and Judge Hughes that Title 5's protections for government employees are both important and long-standing, I do not believe Congress would conclude that those protections outweigh the importance of keeping the remainder of the AIA intact—a statute it debated and refined over a period of more than six years.

I write separately to address one issue: the suggestion in Judge Dyk's dissent that the court's decision to sever the application of Title 5's removal protections from the remainder of the AIA retroactively renders all prior APJ decisions constitutional, thereby obviating the need for panel rehearings in any cases decided under the AIA. Respectfully, that suggestion confuses the *remedy* the panel deemed appropriate in this case with the constitutional *fix* it deemed necessary to allow APJs to render future decisions in proceedings under the AIA.

That dissent urges that, "to be consistent with *Harper*," retroactive application of *Arthrex* and its "remedy" is necessary. Dyk Op. at 17. But that contention misreads *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86 (1993). *Harper* addressed whether a prior Supreme Court decision holding certain taxes unconstitutional applied to taxes levied before that decision issued. *Harper* is best described by the Supreme Court itself: "when (1) the Court decides a case and applies the (new) legal rule of that case to the parties before it, then (2) it and other courts must treat that same (new) legal rule as 'retroactive,' applying it, for example, to all pending cases, whether or not those cases involve predecision events." *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 752 (1995). Judge Dyk argues that the general

rule requiring that we give retroactive effect to constitutional decisions "applies to remedies as well, such as the remedy in this case," meaning, in his view, that once severance occurs, all actions taken by APJs before that point, even if unconstitutional at the time, are rendered constitutional *nunc pro tunc*. Dyk Op. at 17 (citing *Reynoldsville*, 514 U.S. at 759). I disagree. While the principle of retroactive application requires that we afford the same remedy afforded the party before the court to all others still in the appellate pipeline, judicial severance is not a "remedy"; it is a forward-looking judicial fix.

It is true that if, as the panel concluded, the appointment of APJs ran afoul of the Constitution, that fact was true from the time of appointment forward, rendering all APJ decisions under the AIA unconstitutional when rendered. But, no one claims that our declaration of that fact in this case would permit us to reopen closed cases decided under that unconstitutional structure. *See, e.g.*, *Reynoldsville*, 514 U.S. at 758 ("New legal principles, even when applied retroactively, do not apply to cases already closed."). All that *Harper* and *Reynoldsville* say is that we must afford all litigants with pending matters the same remedy we afford to the Arthrex appellant.[1] In other words, we may not give prospective-only effect to our rulings, both as to the merits and as to the precise remedy.

But our curative severance of the statute, does not "remedy" the harm to Arthrex, whose patent rights were adjudicated under an unconstitutional scheme. So too, in *Harper*: the Court's ruling that the state taxes at issue had been collected unconstitutionally did not remedy the harm

---

[1]    This does not mean, of course, that we must provide a remedy to litigants who waived the issue. *United States v. Booker*, 543 U.S. 220, 268 (2005) ("[W]e expect reviewing courts to apply ordinary prudential doctrines" including those relating to waiver and harmless-error).

caused by the unlawful collection of taxes. The Court remanded for additional relief to the litigants before it in the form of reimbursement of the unconstitutionally collected taxes or "some other order" to rectify the "unconstitutional deprivation." *Harper*, 509 U.S. at 98–99, 100–101. We did the same here: the remedy afforded the parties in *Arthrex* is a new hearing before a properly appointed panel of judges. Under the Supreme Court's Appointments Clause jurisprudence, Arthrex is entitled to that relief because "the 'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official." *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2055 (2018) (quoting *Ryder v. United States*, 515 U.S. 177, 183, 188 (1995)); *see also NLRB v. Noel Canning*, 573 U.S. 513, 521, 557 (2014); *Bowsher v. Synar*, 478 U.S. 714, 736 (1986). Our decision that the statute can be *rendered* constitutional by severance does not remedy any past harm—it only avoids continuing harm in the future. It is only meaningful prospectively, once severance has occurred.[2]

The Government agrees. *See* Supp. Br. of United States, *Polaris v. Kingston*, Nos. 2018-1768, -1831, at 13–14. Presented with an opportunity to brief this very issue, the Government expressly rejected the suggestion in Judge Dyk's concurrence in *Bedgear, LLC v. Fredman Bros. Furniture Co.*, 783 F. App'x 1029 (Fed. Cir. 2019) (and his dissent here) that the *Arthrex* panel's severance order applies

---

[2]    That dissent's attempt to distinguish *Lucia* is predicated on this same misunderstanding of *Harper*. Because judicial severance of one portion of an unconstitutional statute is, by necessity, only applicable prospectively, I agree with the *Arthrex* panel that a new hearing before a new panel of APJs is the only appropriate remedy for those whose proceedings were tainted by the constitutional violation.

retroactively. *Id.* ("[N]either *Arthrex*'s determination that the statutory restrictions on removal of APJs violated the Appointments Clause, nor the panel's invalidation of those restrictions, was sufficient to eliminate the impact of the asserted constitutional violation on the original agency decision.").

The cases on which the dissent relies do not counsel a contrary conclusion. For example, the suggestion that, in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), "[t]he Court did not view [severance] as fixing the problem only prospectively" reads too much into the case. Dyk Op. at 21. *Free Enterprise* considered the petitioners' request for a declaratory judgment that the Public Company Accounting Oversight Board is unconstitutional and for an injunction preventing the Board from exercising any of its powers prospectively. 561 U.S. at 510. The Court held that statutory restrictions on the Securities and Exchange Commission's power to remove Board members were "unconstitutional and void," and invalidated the removal provision. *Id.* at 509–10. The Court further held that, because it found the unconstitutional removal provisions could be excised from the remainder of the statute, "petitioners [were] not entitled to broad injunctive relief against the Board's *continued* operations." *Id.* at 513 (emphasis added). The decision did not render all prior Board actions constitutional. The Court simply explained that, by virtue of having severed the non-removal provisions, the Board could act in the future free of the taint of those unconstitutional provisions.

Like *Harper*, neither *Reynoldsville* nor *Edmond v. United States*, 520 U.S. 651, 662–63 (1997), support the dissent's position that rehearing before a new panel is unnecessary. In *Reynoldsville*, the Court made clear—as it did in *Harper*—that any remedy provided the party bringing the original constitutional challenge must be afforded to all other parties with cases that remained open. 514 U.S. at 758–59. It held that a court may not fashion a

6                              ARTHREX, INC. v. SMITH & NEPHEW, INC.

remedy for a party before it and then declare that the remedy not apply to any other party still in the pipeline—i.e., whose claim was decided under an unconstitutional scheme and remains open. *Id.* at 753–54. And in *Edmond,* the challenged appointment was found constitutional. 520 U.S. at 655, 666. Severance was not even at issue. Neither case addressed retroactive application of orders fixing constitutional violations by severance.

By contrast, *Booker* makes clear that, even once judicial severance of a statute occurs, individuals adjudged under the statute as originally written still are entitled to a remedy if their cases are pending on direct review. In *Booker*, the Supreme Court held that 18 U.S.C. § 3553(b)(1)—the provision of the federal sentencing statute making the United States Sentencing Guidelines mandatory—violated the Sixth Amendment's requirement that juries, not judges, find facts relevant to sentencing. 543 U.S. at 244. Accordingly, the Court severed and excised § 3553(b)(1) from the statutory scheme. And, the Court ruled that any defendant whose sentence was "authorized by the jury's verdict—a sentence lower than the sentence authorized by the Guidelines as written . . . *may seek resentencing under the system set forth in today's opinions.*" *Id.* at 267–68 (emphasis added). In permitting a defendant to seek resentencing post-severance, the Supreme Court made clear that judicial severance of a statute is necessarily a prospective act. *Id.*; *see also Free Enter.*, 561 U.S. at 513. This is the same conclusion reached by the DC Circuit in *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (2012), with which the panel decision in this case rightly agrees.

The dissent's attempt to read retroactive application of severance orders designed to obviate future or ongoing constitutional violations into *Harper* and the other Supreme Court case law it cites, respectfully, is misplaced. Those cases address retroactive application of remedies, not the forward-looking curative act of severance.

# United States Court of Appeals for the Federal Circuit

---

**ARTHREX, INC.,**
*Appellant*

**v.**

**SMITH & NEPHEW, INC., ARTHROCARE CORP.,**
*Appellees*

**UNITED STATES,**
*Intervenor*

---

2018-2140

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2017-00275.

---

DYK, *Circuit Judge*, with whom NEWMAN and WALLACH, *Circuit Judges* join, and with whom HUGHES, *Circuit Judge*, joins as to Part I.A, dissenting from the denial of rehearing en banc.

I respectfully dissent from the court's decision not to rehear this case en banc.

The panel here holds that the appointment of Administrative Patent Judges ("APJs"), when conducted in accordance with the America Invents Act ("AIA"), would be unconstitutional if those APJs were protected by the

removal provisions of Title 5.  The panel avoids this result by severing the Title 5 removal provisions as applied to APJs, and thereby "render[ing] the APJs inferior officers and remedy[ing] the constitutional appointment problem." *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320, 1325 (Fed. Cir. 2019).

As discussed in Part I, I conclude that even if the panel were correct that the present structure of IPR proceedings violates the Appointments Clause, the draconian remedy chosen by the panel—invalidation of the Title 5 removal protections for APJs—rewrites the statute contrary to Congressional intent.  That remedy should not be invoked without giving Congress and the United States Patent and Trademark Office ("PTO") itself the opportunity to devise a less disruptive remedy.  In Part II, I conclude that even if the Title 5 remedy were adopted, this would not require invalidation of preexisting Board decisions.  In Part III, I address the question of whether APJs are principal officers.

I

A

The panel's invalidation of Title 5 removal protections and severance is not consistent with Supreme Court precedent.  Severability analysis requires "looking to legislative intent." *United States v. Booker*, 543 U.S. 220, 246 (2005) (collecting cases).  In performing this analysis, the court cannot sever portions of the statute that would be consistent with "Congress' basic objectives in enacting the statute." *Booker*, 543 U.S. at 259.  Severance is appropriate if the remaining statute "will function in a manner consistent with the intent of Congress." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987) (emphasis omitted).  The panel departs from these requirements.  By eliminating Title 5 removal protections for APJs, the panel is performing major surgery to the statute that Congress could not possibly have foreseen or intended.

Removal protections for administrative judges have been an important and longstanding feature of Congressional legislation, and this protection continued to be an important feature of the AIA enacted in 2011, as Judge Hughes detailed in his concurrence in *Polaris Innovations Ltd. v. Kingston Tech. Co., Inc.*, 792 F. App'x 820, 828–830 (Fed. Cir. 2020) (Hughes, J., concurring).

Before the passage of the Administrative Procedure Act ("APA") in 1946, administrative law judges (then called "hearing examiners") did not have any removal protections or any special status distinguishing them from other agency employees. *See Ramspeck v. Fed. Trial Examiners Conference*, 345 U.S. 128, 130 (1953). "Many complaints were voiced against the actions of the hearing examiners, it being charged that they were mere tools of the agency concerned and subservient to the agency heads in making their proposed findings of fact and recommendations." *Id.* at 131. To address these concerns in the APA, Congress "provide[d] for a special class of semi-independent subordinate hearing officers," H.R. Rep. No. 79-1980, at 10 (1946). "Since the securing of fair and competent hearing personnel was viewed as 'the heart of formal administrative adjudication,' the Administrative Procedure Act contain[ed] a number of provisions designed to guarantee the independence of hearing examiners." *Butz v. Economou*, 438 U.S. 478, 514 (1978) (quoting Final Report of the Attorney General's Committee on Administrative Procedure 46 (1941) (citation omitted)).

One such provision was Section 11 of the APA, which provided that Administrative Law Judges ("ALJs") generally would be "removable . . . only for good cause," Administrative Procedure Act, ch. 324, § 11, 60 Stat. 237, 244 (1946). These provisions were continued in the Civil Service Reform Act of 1978. H.R. Rep. No. 95-1403, at 304 (1978) ("An administrative law judge appointed under section 3105 of this title may be removed by the agency in which he is employed only for good cause established and

determined by the Civil Service Commission on the record after opportunity for hearing."). This for-cause removal protection was codified in 5 U.S.C. § 7521.[1]

While the protections of section 7521 were inapplicable to administrative judges of the PTO (since they were not "appointed under section 3105"), similar concerns led to the enactment of protections for PTO administrative judges. Current APJs trace their lineage to the PTO's examiners-in-chief, who were originally nominated by the President and confirmed by the Senate. *Arthrex*, 941 F.3d at 1334; 35 U.S.C. § 3 (1952). Beginning with the 1975 amendments to Title 35, the examiners-in-chief (now APJs) were "remove[d] . . . from the political arena by changing these positions from ones of Presidential appointment." *Hearings Before Subcommittee No. 3 of the Committee on the Judiciary House of Representatives*, 92d Cong. 43 (1971) (statement Of Edward J. Brenner, Former Commissioner Of Patents). The 1975 amendment gave the Secretary of Commerce the sole authority to appoint examiners-in-chief "under the classified civil service." 35 U.S.C. § 7 (1976); *see also* An Act to Amend Title 35, United States Code,

---

[1] "An action may be taken against an administrative law judge appointed under section 3105 of this title by the agency in which the administrative law judge is employed only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521 (emphasis added). Though Executive Order 13843, dated July 10, 2018, placed all administrative law judges in the excepted service, and thus "not subject to the requirements of 5 CFR, part 302" and further amended 5 C.F.R. § 6.4 to eliminate the application of title 5 protections to administrative law judges in general, the order was limited by this statutory provision. 83 Fed. Reg. 32756–57 ("Except as required by statute . . . .").

"Patents", and For Other Purposes, Pub. L. 93-601, §§ 1-2, 88 Stat. 1956 (1975) (codified as amended at 35 U.S.C. §§ 3, 7 (1976)); *Polaris*, 792 F. App'x at 828–29 (Hughes, J., concurring).  This had the result of extending the Civil Service protections for competitive service employees to the examiners-in-chief (now APJs).  *See Arnett v. Kennedy*, 416 U.S. 134, 150–51 (1974), *overruled in part on other grounds by Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).  This included both provisions concerning appointment and removal.

Until 1999, despite several amendments, Congress retained the status of APJs as federal employees in the competitive service under Title 5.  *Polaris*, 792 F. App'x at 829 (Hughes, J., concurring) (citing Patent Law Amendment Acts of 1984, Pub. L. 98-622, title II, sec. 201, § 7(a), 98 Stat. 3383, 3386 (1984) (codified as amended at 35 U.S.C. § 7 (1988), and the 1978 Civil Service Reform Act, Pub. L. 95-454, 92 Stat. 1121)).  In 1999, Congress eliminated the requirement that APJs be appointed under competitive service provisions, but added the current 35 U.S.C. § 3(c) language, which extended Title 5 removal protections to APJs.  Patent and Trademark Office Efficiency Act, Pub. L. 106-113, ch. 1, sec. 4713, § 3(c), 113 Stat. 1501A (codified as amended at 35 U.S.C. § 3(c) (2000)).[2]  Thus, although APJs were not subject to appointment as competitive service employees, "APJs remained subject to discipline or dismissal subject to the efficiency of the service standard." *Polaris*, 792 F. App'x at 830 (Hughes, J., concurring).  Significantly, the language of § 3(c) remained unaltered

---

[2]   In fact, even when certain prior bills of the 1999 Act were considering making the PTO exempt from Title 5, a special carve out provision was always contemplated for "quasi-judicial examiners," who would still be removable "only for such cause as will promote the efficiency" of the agency.  S. Rep. No 105-42, at 9, 48 (1997).

despite the otherwise major overhaul in AIA legislation. *See id.* at 830; 35 U.S.C. § 3(c) (2012). Those removal protections were seen as essential to fair performance of the APJs quasi-judicial role.

In sum, ALJs in general and APJs in particular have been afforded longstanding and continuous protection from removal. The panel gives little weight to the existing statutory protections in its severance analysis. Moreover, here, the provision being partially invalidated is not even part of the Patent Act but is instead in Title 5.[3] Elimination of those protections cannot be squared with Congressional design.

To be sure, I do not suggest that the inappropriateness of the Title 5 invalidation should lead to invalidation of the entire AIA statutory scheme. What I do suggest is that Congress almost certainly would prefer the opportunity to itself fix any Appointments Clause problem before imposing the panel's drastic remedy.

There is no question that Congress could pass a far simpler and less disruptive fix and that such a fix is available—Congress could amend the statute to provide agency review of APJ decisions.[4] Soon after the issuance of the

---

[3] The panel relies on *Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012), to justify its severance decision. However, that case is neither binding nor apposite to the situation here. In *Intercollegiate*, the severed removal protections were part of the same substantive statute that authorized the Copyright Royalty Judges and there was no showing that excising the removal protections was contrary to Congressional intent. *Id.* at 1340–41; *see also* 17 U.S.C. § 802.

[4] In fact, Congressional fixes of PTAB Appointments Clause problems have been a feature of past Congressional

panel *Arthrex* opinion, the House Judiciary Committee held hearings to discuss the remedial implications of this case. *The Patent Trial and Appeal Board and the Appointments Clause: Implications of Recent Court Decisions: Hearing Before the Subcommittee on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 116th Cong. (2019) ("*Arthrex* Hearing").[5] At the hearing, subcommittee members expressed concern that striking the removal protections for APJs would be "inconsistent with the idea of creating an adjudicatory body" capable of "providing independent impartial justice." *Id.* at 45:30 (statement of Rep. Hank Johnson). They agreed that it was Congress, not this court, that bears the "responsibility to consider a legislative fix," *id.* at 46:00–47:00 (statement of Rep. Hank Johnson), and "question[ed] whether [the panel decision was] the right way to achieve the apparent objective behind the Appointments Clause jurisprudence, namely, to ensure that there is an official sufficiently accountable to the President, who signs off on important executive branch decisions," *id.* at 53:00 (statement of Rep. Jerrold Nadler).

Both subcommittee members and witnesses urged that providing agency review of PTAB decisions was a preferable solution. They noted how this could be achieved: (1) establishing a review board comprised of properly appointed principal officers with authority to review APJ

---

legislation. *See* Patent and Trademark Administrative Judges Appointment Authority Revision, Pub. L. 110-313, § 1, 122 Stat. 3014, 3014 (2008) (codified as amended at 35 U.S.C. § 6(a) (2012)) (providing for appointments of APJs by Secretary of Commerce instead of by the Director).

[5]    Citations are to the video recording of the hearing, available at https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=2249.

8                                    ARTHREX, INC. v. SMITH & NEPHEW, INC.

decisions, or (2) providing review of APJ decisions by the Director.[6]

If Congress provided such agency review of APJ panel decisions, this would cure the core constitutional issue identified by the panel by subjecting all APJ decisions to review by a principal officer. If APJs were subject to review by executive officials at the PTO, then they would no longer be principal officers. The APJs would "have no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers, and hence they [would be] inferior officers within the meaning of Article II." *Edmond*, 520 U.S. at 665; *id.* at 664–65 (concluding that the judges of the Coast Guard Court of Criminal Appeals are inferior officers because the Court of Appeals for the Armed Forces has the "power to reverse decisions of the court" if it "grants review upon petition of the accused"); *id.* at 662 ("Whether one is an 'inferior officer' depends on whether he has a superior."); *see also Freytag v. Comm'r*, 501 U.S. 868, 881–82 (1991) (holding that a Tax Court special trial judge is an "inferior officer" even though "special trial judges . . . render [final] decisions of the Tax Court in [certain] cases"); *Helman v. Dep't of Veterans Affairs*, 856 F.3d 920, 929 (Fed. Cir. 2017) ("[T]he special trial judges [were] inferior officers [in *Freytag*]."). Even the panel here appears to agree. *Arthrex*, 941 F.3d at 1329–31 (in finding an Appointments Clause violation, relying on there being "no provision or procedure providing the Director the power to single-handedly review, nullify or reverse a final written decision issued by a panel of APJs").

---

[6]     *Id.* at 1:04:00 (statement of John F. Duffy); *id.* at 1:16:20 (statement of Arti K. Rai); *id.* at 1:42:12 (statement of Rep. Hank Johnson); *see also id.* at 1:11:00 (statement of John M. Whealan); *id.* at 1:44:23–1:46:30 (witnesses arguing for unilateral review by the Director).

Supreme Court precedent and circuit authority support a temporary stay to allow Congress to implement a legislative fix in the Appointments Clause context. *Buckley v. Valeo*, 424 U.S. 1, 144 (1976) (finding the Federal Election Commission's exercise of enforcement authority to be a violation of the Appointments Clause, but "draw[ing] on the Court's practice in the apportionment and voting rights cases and stay[ing] . . . the Court's judgment" to "afford Congress an opportunity to reconstitute the Commission by law or to adopt other valid enforcement mechanisms"); *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) (staying a judgment holding that "the broad grant of jurisdiction to the bankruptcy courts contained in 28 U.S.C. § 1471 [(1976)] is unconstitutional" for over three months in order to "afford Congress an opportunity to reconstitute the bankruptcy courts or to adopt other valid means of adjudication, without impairing the interim administration of the bankruptcy laws"); *see also Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ("Our judgment is stayed for a period not to exceed 60 days to permit Congress to implement the [constitutional] fallback [reporting] provisions [of the Balanced Budget and Emergency Deficit Control Act]."); *Md. Comm. for Fair Representation v. Tawes*, 377 U.S. 656, 676 (1964) (after finding a reapportionment violation, suggesting that the state legislature be given the opportunity "to enact a constitutionally valid state legislative apportionment scheme"); *Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 863 (1st Cir. 2019) ("[O]ur mandate in these appeals shall not issue for 90 days, so as to allow the President and the Senate to validate the currently defective appointments or reconstitute the Board in accordance with the Appointments Clause.").

B

So too, it may well be that Congressional legislation would be unnecessary because the agency itself could fix the problem by creating an agency review process. As discussed below, the Director may be able to designate a

special panel to rehear decisions rendered by the original panel of APJs, that rehearing panel to be composed of only officers not subject to Title 5 removal protections, i.e., an executive rehearing panel with panel members appointed by the President or essentially removable at will by the Secretary of Commerce—the Director, the Deputy Director, and the Commissioner of Patents. *See, e.g.*, Patent Trial and Appeal Board Standard Operating Procedure 2 (version 10), https://www.uspto.gov/sites/default/files/documents/SOP2%20R10%20FINAL.pdf. Far from raising separation of powers concerns, this approach permits the agency to chart its own course as to the appropriate fix.

Section 6(c) requires that "[e]ach appeal . . . and inter partes review shall be heard by at least 3 members of the Patent Trial and Appeal Board." 35 U.S.C. § 6(c). It also specifies that "[o]nly the Patent Trial and Appeal Board may grant rehearings." *Id.* Section 6(a) provides that "[t]he Director, the Deputy Director, the Commissioner of Patents, the Commissioner for Trademarks, and the administrative patent judges shall constitute the Patent Trial and Appeal Board." 35 U.S.C. § 6(a). And the statute provides that panel members "shall be designated by the Director." 35 U.S.C. § 6(c).[7]

There is no requirement in the statute or regulations that the rehearing panel be the same as the original panel. We have previously held that the statutory grant of authority under section 6(c) (then 35 U.S.C. § 7 (1988)) to "designate the members of a panel hearing an appeal . . .

---

[7] The Director is "responsible for providing policy direction and management supervision for the Office," 35 U.S.C. § 3(a)(2)(A), with the authority to "govern the conduct of the proceedings in the Office," 35 U.S.C. § 2(b)(2)(A). He is also "vested" with "[t]he powers and duties of the United States Patent and Trademark Office." 35 U.S.C. § 3(a)(1).

extend[s] to [the] designation of a panel to consider a re-quest for rehearing." *In re Alappat*, 33 F.3d 1526, 1533 (Fed. Cir. 1994), *abrogated on other grounds by In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) (interpreting an earlier ver-sion of the statute); *see also Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 138 S. Ct. 1365, 1381 (2018) ("[T]he Director can add more members to the panel—including himself—and order the case reheard.") (Gorsuch, J., dissenting, with Chief Justice Roberts join-ing). "In those cases where a different panel of the Board is reconsidering an earlier panel decision, the Board is still the entity reexamining that earlier decision; it is simply doing so through a different panel." *Id.* at 1533–34. The regulations do not specify the composition of a rehearing panel, simply stating that "[w]hen rehearing a decision on petition, a panel will review the decision for an abuse of discretion." 37 C.F.R. § 42.71(c) (emphasis added).

The legislative history similarly confirms the Direc-tor's authority. In 1927, Congress, at the same time that it eliminated the provision requiring the Commissioner (now the Director) to review board of examiner decisions, made clear that the "supervisory power of the commissioner [to rehear panel decisions], as it has existed for a number of decades, remains unchanged by the bill." S. Rep. No. 69-1313, at 4 (1927).

The Director has previously created such special re-hearing panels. *See Arthrex*, 941 F.3d at 1330 ("That standing [Precedential Opinion] [P]anel, composed of at least three Board members, can rehear and reverse any Board decision and can issue decisions that are binding on all future panels of the Board."); *see also* Patent Trial and Appeal Board Standard Operating Procedure 2 (version 10), https://www.uspto.gov/sites/default/files/documents/SOP2%20R10%20FINAL.pdf.

A rehearing panel consisting of the Director, the Dep-uty Director, and the Commissioner of Patents would itself

comply with the Appointments Clause. The Director is a principal officer appointed by the President and confirmed by the Senate.[8] The Deputy Director and the Commissioner of Patents are properly appointed inferior officers because they are removable by principal officers. "The power to remove officers, [the Supreme Court has] recognized, is a powerful tool for control." *Edmond*, 520 U.S. at 664. The Deputy Director is appointed by the Secretary of Commerce (a Presidentially appointed officer) under 35 U.S.C. § 3(b)(1). The Deputy Director is removable at will by the Secretary of Commerce because "[i]n the absence of all constitutional provision, or statutory regulation as to the removal of [inferior] officers, . . . the power of removal [is] incident to the power of appointment." *In re Hennen*, 38 U.S. 230, 259 (1839).[9]    Under the statute,

---

[8]    The statute also specifies that the Director is appointed and removable at will by the President. 35 U.S.C. § 3(a)(1), (4).

[9]    The Deputy Director is not an "employee" for purposes of 5 U.S.C. § 7513, which provides removal protections to PTO officers and employees through 35 U.S.C. § 3(c)'s application of Title 5 to the PTO's "[o]fficers and employees." Section 7511(b)(2)(C) of Title 5 excludes from the definition of "employees" subject to these protections those "employees whose position has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character" by "the head of an agency for a position excepted from the competitive service by statute." The legislative history of this provision indicates that political appointees (of which the Deputy Director is one) were not meant to be included in the definition of "employee" for purposes of § 7513 removal protections. H.R. Rep. No. 101-328, 4–5 (1989); *see also Special Counsel v. Peace Corps*, 31 M.S.P.R. 225, 231 (1986) ("The[] terms ['policy-making,' 'confidential,' and 'policy-advocating'] . . . are, after all,

"Commissioners [such as the Commissioner of Patents] may be removed from office by the Secretary for misconduct or nonsatisfactory performance . . . , without regard to the provisions of title 5"—essentially at-will removal. 35 U.S.C. § 3(b)(2)(C). In contrast, to be removed under Title 5, "the agency must show . . . that the employee's misconduct <u>is likely to have an adverse impact on the agency's performance of its functions</u>." *Brown v. Dep't of the Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000) (emphasis added).

The Deputy Director and the Commissioner of Patents are also inferior officers because they are supervised by the Director. Again, in *Edmond*, the Supreme Court "th[ought] it evident that 'inferior officers' are officers whose work is directed and supervised <u>at some level</u> by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 662 (emphasis added). The Director has significant administrative oversight of the duties of these two officers. The USPTO's organizational chart shows that the Deputy Director and the Commissioner of Patents report to the Director. *See, e.g.*, *USPTO Fiscal Year 2019 Congressional Justification*, at 3, https://www.uspto.gov/sites/default/files/documents/fy19pbr.pdf. The Deputy Director is appointed by the Secretary of Commerce only "upon nomination by the Director." 35 U.S.C. § 3(b)(1). And the Secretary of Commerce, acting through the Director, annually evaluates the Commissioner's performance, which determines the Commissioner's annual bonus. 35 U.S.C. § 3(b)(2)(B).

In sum, the roles that would be played by these three members of an executive rehearing panel would be

---

only a shorthand way of describing positions to be filled by so-called 'political appointees.'"); *Aharonian v. Gutierrez*, 524 F. Supp. 2d 54, 55 (D.D.C. 2007) (describing the appointment of the PTO Deputy Director as a "decision[] involving high-level policymaking personnel.").

constitutional because the Director is a principal officer, and the Deputy Director and the Commissioner of Patents are inferior officers subject to the supervision of the Director of and the Secretary. If an appropriate stay were granted, it would seem possible that the Director, if he chose to do so, could achieve agency review without Congressional legislation.

Of course, as I discuss in the next section, either a Congressional fix or an agency fix could not be retroactive. The new rehearing procedure would have to be made available to losing parties in past cases.

## II

Alternatively, I conclude that if the panel's Title 5 protection remedy remained, this would still not require a remand for a new hearing before a new panel, as the *Arthrex* panel opinion holds. *Arthrex*, 941 F.3d at 1340. This new hearing remedy is not required by *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018), imposes large and unnecessary burdens on the system of *inter partes* review, and involves unconstitutional prospective decision-making.

## A

After holding the APJ removal protection provisions unconstitutional and severable, the panel set aside all panel decisions of the Board where the issue was properly raised on appeal. These cases are remanded for a new hearing before a new panel "[b]ecause the Board's decision in this case was made by a panel of APJs that were not constitutionally appointed at the time the decision was rendered." *Arthrex*, 941 F.3d at 1338.

This holding is in part constitutional interpretation and part statutory construction. In essence, the panel improperly makes the application of its decision prospective only, so that only PTAB decisions after the date of the panel's opinion are rendered by a constitutionally appointed panel. In my view, the panel improperly declined

to make its ruling retroactive. If the ruling were retroactive, the actions of APJs in the past would have been compliant with the constitution and the statute. In this respect, I think that the panel in *Arthrex* ignored governing Supreme Court authority.

B

I first address the *Arthrex* panel's claim that *Lucia* mandates remanding for a new hearing. In *Lucia*, the issue was whether Securities and Exchange Commission ("SEC") ALJs were inferior officers that had to be appointed by an agency head—the SEC. *Lucia*, 138 S. Ct. at 2051 & n.3 (2018). The Supreme Court held that "[t]he Commission's ALJs are 'Officers of the United States,' subject to the Appointments Clause." *Id.* at 2055. The ALJs were found to be unconstitutionally appointed as "Officers of the United States" because they were appointed by "[o]ther staff members, rather than the Commission proper." *Id.* at 2049, 2051.

While the case was pending, "the SEC issued an order 'ratif[ying]' the prior appointments of its ALJs," thus apparently curing the constitutional defect.[10] *Id.* at 2055 n.6 (alteration in original) (quoting SEC Order, *In re: Pending Administrative Proceedings* (Nov. 30, 2017), https://www.sec.gov/litigation/opinions/2017/33-10440.pdf). The Supreme Court nevertheless held that "the 'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official." *Id.* at 2055 (quoting *Ryder v. United States*, 515 U.S. 183, 183, 188 (1995)).

The difference between *Lucia* and *Arthrex* is that the fix in *Lucia* was an agency fix, whereas the fix in *Arthrex*

---

[10] The Court declined to decide whether the agency cured the defect when it "ratified" the appointments, but assumed that it did so. *Lucia*, 138 S. Ct. at 2055 n.6.

16                    ARTHREX, INC. v. SMITH & NEPHEW, INC.

is a judicial fix.  Agencies and legislatures generally act only prospectively, while a judicial construction of a statute or a holding that a part of the statute is unconstitutional and construing the statute to permit severance are necessarily retrospective as well as prospective.

C

As the Supreme Court concluded in *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298 (1994), in construing a statute, courts are "explaining [their] understanding of what the statute has meant <u>continuously since the date when it became law.</u>" *Id*. at 313 n.12 (emphasis added).  The same is true as to constitutional decisions, as *Harper v. Virginia Dep't of Taxation,* 509 U.S. 86 (1993) confirmed: "'[B]oth the common law and our own decisions' have 'recognized a general rule of retrospective effect for the constitutional decisions of this Court.'" *Id.* at 94 (quoting *Robinson v. Neil*, 409 U.S. 505, 507 (1973)).  As Justice Scalia put it in his concurrence in the later *Reynoldsville* decision:

> In fact, what a court does with regard to an unconstitutional law is simply to <u>ignore</u> it.  It decides the case "<u>disregarding the [unconstitutional] law</u>," *Marbury* v. *Madison*, 1 Cranch 137, 178 (1803) (emphasis added), because a law repugnant to the Constitution "is void, and is as no law," *Ex parte Siebold*, 100 U.S. 371, 376 (1880).

*Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 760 (1995) (Scalia, J., concurring) (alterations in original).  In other words, "[w]hen [a c]ourt applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the

court's] announcement of the rule." *Harper*, 509 U.S. at 97.[11]

The requirement for retroactivity applies to remedies as well, such as the remedy in this case. In *Reynoldsville*, the Court reversed an Ohio Supreme Court decision declining to apply a constitutional decision as to a limitations period retroactively. 514 U.S. at 759. The Court rejected the respondent's argument that the Ohio Supreme Court's decision was based on "remedy" rather than "non-retroactivity" and held that accepting the Ohio Supreme Court's "remedy" would "create what amounts to an ad hoc exemption from retroactivity." *Id.* at 758. The Court noted only four circumstances where retroactive application of a constitutional ruling is not outcome-determinative.[12] None is remotely relevant to *Arthrex*.

Thus, to be consistent with *Harper*, the statute here must be read as though the APJs had always been constitutionally appointed, "disregarding" the unconstitutional

---

[11]  *Harper* overruled prior caselaw that provided for exceptions allowing prospective application of a new rule of law in constitutional and other cases. *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 752 (1995) ("*Harper* overruled [a prior Supreme Court decision] insofar as the [prior] case (selectively) permitted the prospective-only application of a new rule of law.").

[12]  Namely, where there is: "(1) an alternative way of curing the constitutional violation; or (2) a previously existing, independent legal basis (having nothing to do with retroactivity) for denying relief; or (3) as in the law of qualified immunity, a well-established general legal rule that trumps the new rule of law, which general rule reflects both reliance interests and other significant policy justifications; or (4) a principle of law, such as that of 'finality' . . . , that limits the principle of retroactivity itself." *Reynoldsville*, 514 U.S. at 759 (internal citations omitted).

18                    ARTHREX, INC. v. SMITH & NEPHEW, INC.

removal provisions. *Marbury v. Madison*, 5 U.S. 137, 178 (1803). Since no Congressional or agency action is required in order to render the appointment of the PTAB judges constitutional, when the PTAB judges decided cases in the past, they did not act improperly. Thus, the past opinions rendered by the PTAB should be reviewed on the merits, not vacated for a new hearing before a different panel.

To be sure, a new decision or hearing may sometimes be necessary where a deciding official might have acted differently if he had been aware of the unconstitutional nature of a restriction on his authority. That was the situation in *Booker*, where judges' decision-making might have been affected by their perception that the sentencing guidelines were mandatory and where the mandatory provision was held unconstitutional and severed. *Booker*, 543 U.S. at 249–265. *Booker* was not an Appointments Clause case, and even in *Booker*, a new sentencing hearing was not required in every case. *Id.* at 268. Here, even applying the *Booker* approach, it is simply not plausible that the PTAB judges' decision-making would have been affected by the perceived existence or non-existence of the removal protections of Title 5. As the Fifth Circuit has concluded in this respect, "[r]estrictions on removal are different" from Appointments Clause violations where "officers were vested with authority that was never properly theirs to exercise." *Collins v. Mnuchin*, 938 F.3d 553, 593 (5th Cir. 2019) (en banc) (separate majority opinion).[13] As discussed above,

---

[13]  In *Collins*, the Fifth Circuit explained:

Restrictions on removal are different. In such cases the conclusion is that the officers are duly appointed by the appropriate officials and exercise authority that is properly theirs. The problem identified by the [different] majority decision in this case is that, once appointed, they are too distant

*Lucia* required a new determination, but in that case the fix was imposed only prospectively—the making of new appointments by the agency head and the ratification of earlier appointments—rather than a retroactive court decision involving severance. *See Lucia*, 138 S. Ct. at 2055 n.6.

D

While the Circuits appear to be divided as to the retroactivity issue in Appointments Clause and similar cases,[14]

---

from presidential oversight to satisfy the Constitution's requirements.

Perhaps in some instances such an officer's actions should be invalidated. The theory would be that a new President would want to remove the incumbent officer to instill his own selection, or maybe that an independent officer would act differently than if that officer were removable at will. We have found no cases from either our court or the Supreme Court accepting that theory.

938 F.3d at 593–94 (separate majority opinion)

[14]  In *Collins v. Mnuchin*, 938 F.3d 553 (5th Cir. 2019) (en banc), the en banc Fifth Circuit found that the Federal Housing Finance Agency ("FHFA") was unconstitutionally structured because Congress "[g]rant[ed] both removal protection and full agency leadership to a single FHFA Director." *Id.* at 591.  It did not invalidate prior agency actions. *Id.* at 592 (separate majority opinion).  It concluded that the only appropriate remedy, and one that "fixes the . . . purported injury," is a declaratory judgment "removing the 'for cause' provision found unconstitutional." *Id.* 595 (separate majority opinion).

In *Intercollegiate Broadcasting* and *Kuretski*, the D.C. Circuit reached the opposite result.  *See Intercollegiate*

20                    ARTHREX, INC. v. SMITH & NEPHEW, INC.

the very Supreme Court decisions relied on in *Arthrex* have given retroactive effect to statutory constructions or constitutional decisions that remedied potential Appointment Clause violations. In *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), the SEC's Public Company Accounting Oversight Board had instituted an investigation against an accounting firm, Beckstead and Watts ("B&W"). *Id.* at 487. B&W and another affiliated organization, Free Enterprise Fund, filed suit, asking the district court to enjoin the investigation as improperly instituted because members of the Board had not been constitutionally appointed. *Id.* at 487–88. The Supreme Court found that the statutory removal protections afforded to members of the Board were unconstitutional. *Id.* at 484. "By granting the Board executive power without the Executive's oversight [i.e., by limiting removal], th[e Sarbanes-Oxley] Act subvert[ed] the President's ability to ensure that the laws are faithfully

---

*Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012); *Kuretski v. Comm'r*, 755 F.3d 929 (D.C. Cir. 2014). In *Intercollegiate Broadcasting*, the D.C. Circuit found that the appointments of the Copyright Royalty Judges in the Library of Congress violated the Appointments Clause because they could be removed only for cause. 684 F.3d at 1334. The court invalidated the for-cause restriction on the removal of the judges, rendering them "validly appointed inferior officers." *Id.* at 1340–41. Yet, the D.C. Circuit declared that "[b]ecause the Board's structure was unconstitutional at the time it issued its determination, we vacate and remand the determination." *Id.* at 1342. These two cases were not based on Supreme Court precedent, did not consider the Supreme Court precedent suggesting a different result, and were an apparent departure from the Court's rulings in similar circumstances.

executed—as well as the public's ability to pass judgment on his efforts." *Id.* at 498. But the Court severed the unconstitutional removal provisions from the remainder of the statute, leaving the rest of relevant act fully operational and constitutional. *Id.* at 509.

The Court did not view this action as fixing the problem only prospectively. It refused to invalidate or enjoin the prior actions of the Board in instituting the investigation, explaining that "properly viewed, under the Constitution, . . . the Board members are inferior officers" and "have been validly appointed by the full Commission." *Id.* at 510, 513. The Court remanded for further proceedings, but explained that the plaintiffs were only "entitled to declaratory relief sufficient to ensure that the reporting requirements and auditing standards to which they [we]re subject will be enforced only by a constitutional agency accountable to the Executive."[15] *Id.* at 513.

So too in *Edmond v. United States*, 520 U.S. 651 (1997), past actions by the Coast Guard Court of Criminal Appeals were not set aside. The criminal defendants' convictions had been affirmed by the Coast Guard Court of Criminal Appeals. *Id.* at 655. The defendants contended that the Coast Guard Court of Criminal Appeals judges had not been properly appointed, rendering the convictions invalid. *See id.* The issue was "whether Congress ha[d] authorized the Secretary of Transportation to appoint civilian [judges to] the Coast Guard Court of Criminal Appeals, and if so, whether this authorization [wa]s constitutional under the

---

[15] On remand, the parties agreed that the Supreme Court's decision did not require invalidating the Board's prior actions. The agreed-upon judgment stated: "[a]ll relief not specifically granted by this judgment is hereby DENIED." Judgment, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, No. 06-0217 (D.D.C. Feb. 23, 2011), ECF No. 66.

Appointments Clause of Article II [because the judges were inferior officers]." *Id.* at 653.

The Court construed the relevant statutes so that "Article 66(a) d[id] not give [the] Judge Advocates General authority to appoint Court of Criminal Appeals judges; [and] that § 323(a) d[id] give the Secretary of Transportation authority to do so." *Id.* at 658. The Court explained that "no other way to interpret Article 66(a) that would make it consistent with the Constitution" because "Congress could not give the Judge Advocates General power to 'appoint' even inferior officers of the United States." *Id.* The Court then found that the judges of the Coast Guard Court of Criminal Appeals were inferior officers and that "[their] judicial appointments [by the Secretary] . . . [we]re therefore valid." *Id.* at 666. Most significantly, the Court did not remand for a new hearing but rather "affirm[ed] the judgment of the Court of Appeals for the Armed Forces." *Id.* Nowhere did the Court suggest that the actions taken before the Court's construction were rendered invalid.

In Appointments Clause cases, the Supreme Court has required a new hearing only where the appointment's defect had not been cured[16] or where the cure was the result

---

[16] *See Ryder v. United States*, 515 U.S. 177, 187–88 (1995) (declining to apply the *de facto officer* doctrine to preserve rulings made by an unconstitutionally appointed panel); *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 519, 520, 557 (2014) (affirming the DC Circuit in vacating an NLRB order finding a violation because the Board lacked a quorum as "the President lacked the power to make the [Board] recess appointments here at issue"); *see also Bandimere v. Sec. & Exch. Comm'n*, 844 F.3d 1168, 1171, 1188 (10th Cir. 2016) (setting aside opinion of an improperly appointed SEC ALJ where "the SEC conceded the ALJ had not been constitutionally appointed").

of non-judicial action.[17] The contrary decision in *Arthrex* is inconsistent with binding Supreme Court precedent and creates a host of problems in identifying the point in time when the appointments became valid.[18]

*** 

I respectfully suggest that *Arthrex* was wrongly decided for two reasons. First, the panel's remedy invalidating the Title 5 removal protections for APJs is contrary to Congressional intent and should not be invoked without giving Congress and the PTO the opportunity to devise a less disruptive remedy. Second, even if the *Arthrex* remedy (to sever Title 5 protections) were adopted, there would be no need for a remand for a new hearing before a new panel because, under this judicial construction, APJs will be retroactively properly appointed by the Secretary of

---

[17] *See Lucia*, 138 S. Ct. at 2055 n.6; *see also Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 679 (6th Cir. 2018) (improperly appointed ALJ's decision vacated despite Mine Commission's attempt to cure the improper appointment during judicial review by ratifying the appointment of every ALJ); *Cirko on behalf of Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 152 (3d Cir. 2020) (affirming district court's remand for a new hearing before properly appointed Social Security Administration ALJs despite SSA's later reappointment of all agency judges).

[18] The difficulty of identifying at what point in time the appointments becomes effective is evident. Is it when the panel issues the decision, when the mandate issues, when en banc review is denied, when certiorari is denied, or (if there is an en banc proceeding) when the en banc court affirms the panel, or (if the Supreme Court grants review) when the Supreme Court affirms the court of appeals decision?

24                    ARTHREX, INC. v. SMITH & NEPHEW, INC.

Commerce and their prior decisions will not be rendered invalid.

III

Finally, the panel's conclusion that PTAB judges are principal officers under the existing statutory structure is open to question. It does appear to be the case under the Supreme Court's decision in *Lucia* that PTAB judges are "officers," but it seems to me far from clear that they are "principal officers." The panel concluded that they were because "'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Arthrex*, 941 F.3d at 1329 (quoting *Edmond*, 520 U.S. at 662–63). The panel held that no principal officer "exercise[d] sufficient direction and supervision over APJs to render them inferior officers." *Id.* Despite the quoted language in *Edmond*, I do not think that the sole distinction between "inferior officers" and "principal officers" lies in agency supervision. In *Morrison v. Olson*, 487 U.S. 654 (1988), the Supreme Court held that an independent counsel was an "inferior officer" despite the fact that she was removable only for "good cause" and "possesse[d] a degree of independent discretion to exercise the powers delegated to her," *id.* at 671, 691.

In *Morrison*, the Court was in part persuaded by the fact that the independent counsel's "grant of authority d[id] not include any authority to formulate policy for the Government or the Executive Branch." *Morrison*, 487 U.S. at 671. The First Circuit squared the holdings in *Edmond* and *Morrison* "by holding that *Edmond*'s supervision test was sufficient, but not necessary." *Aurelius*, 915 F.3d at 860. The First Circuit explained that "inferior officers are those who are directed and supervised by a presidential appointee; otherwise, they 'might still be considered inferior officers if the nature of their work suggests sufficient

limitations of responsibility and authority.'" *Id.* (quoting *United States v. Hilario*, 218 F.3d 19, 25 (1st Cir. 2000)).

Similarly, here, it seems appropriate to also examine whether the role of the officers in question includes articulation of agency policy. PTAB judges have no such role. They are not charged with articulating agency policy, and certainly are not the principal officers charged with that articulation. Their sole function is to determine the facts in individual patent challenges under the AIA; as to the law, they are obligated to follow the law as articulated by the Supreme Court and this court. It appears to be the case that review of administrative judges' decisions by an Article I court prevented the administrative judges in *Edmond* and *Masias v. Sec'y of Health & Human Servs.*, 634 F.3d 1283 (Fed. Cir. 2011), from being "officers." *See Edmond*, 520 U.S. at 664; *Masias*, 634 F.3d at 1294. It is hard for me to see how identical review by an Article III court (which severely cabins the authority of PTAB judges) does not prevent PTAB judges from being principal officers.

# United States Court of Appeals
# for the Federal Circuit

---

**ARTHREX, INC.,**
*Appellant*

**v.**

**SMITH & NEPHEW, INC., ARTHROCARE CORP.,**
*Appellees*

**UNITED STATES,**
*Intervenor*

---

2018-2140

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2017-00275.

---

HUGHES, *Circuit Judge*, with whom WALLACH, *Circuit Judge*, joins, dissenting from the denial of the petitions for rehearing *en banc*.

I respectfully dissent from the court's decision declining to rehear this appeal *en banc*. I believe that, viewed in light of the Director's significant control over the activities of the Patent Trial and Appeal Board and Administrative Patent Judges, APJs are inferior officers already properly appointed by the Secretary of Commerce. And even if APJs are properly considered principal officers, I have grave doubts about the remedy the *Arthrex* panel

2                    ARTHREX, INC. v. SMITH & NEPHEW, INC.

applied to fix their appointment. In the face of an unconstitutional statute, our role is to determine whether severance of the unconstitutional portion would be consistent with Congress's intent. Given the federal employment protections APJs and their predecessors have enjoyed for more than three decades, and the overall goal of the America Invents Act, I do not think Congress would have divested APJs of their Title 5 removal protections to cure any alleged constitutional defect in their appointment. As Judge Dyk suggests in his dissent, which I join as to Part I.A, I agree that Congress should be given the opportunity to craft the appropriate fix. Dyk Op. at 6.

I

None of the parties here dispute that APJs are officers who exercise "significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam). But "significant authority" marks the line between an officer and an employee, not a principal and an inferior officer. Despite being presented with the opportunity to do so, the Supreme Court has declined to "set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes." *Edmond v. United States*, 520 U.S. 651, 661 (1997).

Instead, the pertinent cases make clear that the hallmark of an inferior officer is whether a presidentially-nominated and senate-confirmed principal officer "direct[s] and supervise[s] [her work] at some level." *Id.* at 663. *Edmond* does not lay out a more exacting test than this, and we should not endeavor to create one in its stead. Instead, I believe the Supreme Court has engaged in a context-specific inquiry accounting for the unique systems of direction and supervision of inferior officers in each case. *See infra* Section I. Importantly, the Court has not required that a principal officer be able to single-handedly review and reverse the decisions of inferior officers, or remove them at

will, to qualify as inferior.  And I believe that the Supreme Court would have announced such a simple test if it were proper.

Finally, *Edmond* also makes clear that the Appointments Clause seeks to "preserve political accountability relative to important government assignments."  520 U.S. at 663.  The Director's power to direct and supervise the Board and individual APJs, along with the fact that APJs are already removable under the efficiency of the service standard, provides such political accountability.  APJs are therefore inferior officers.

A

The Director may issue binding policy guidance, institute and reconsider institution of an *inter partes* review, select APJs to preside over an instituted *inter partes* review, single-handedly designate or de-designate any final written decision as precedential, and convene a panel of three or more members of his choosing to consider rehearing any Board decision.   The *Arthrex* panel categorized some of these as "powers of review" and others as "powers of supervision," but I view them all as significant tools of direction and supervision.

As *Arthrex* recognized, "[t]he Director is 'responsible for providing policy direction and management supervision' for the [United States Patent and Trademark Office]."  *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320, 1331 (Fed. Cir. 2019) (quoting 35 U.S.C. § 3(a)(2)(A)).  Not only can the Director promulgate regulations governing *inter partes* review procedures, but he may also prospectively issue binding policy guidance "interpreting and applying the patent and trademark laws." Gov't. Br. 37.  APJs must apply this guidance in all subsequent *inter partes* review proceedings.  Such guidance might encompass, for instance, exemplary application of the law to specific fact patterns, such as those posed in pending cases.  These powers provide the Director with control over the process and

4                    ARTHREX, INC. v. SMITH & NEPHEW, INC.

substance of Board decisions.  Gov't. Br. 36–37.  And
though the Director cannot directly reverse an individual
Board decision that neglects to follow his guidance, APJs
who do so risk discipline or removal under the efficiency of
the service standard applicable under Title 5.  *See infra*
Section I C.  Such binding guidance, and the consequences
of failing to follow it, are powerful tools for control of an
inferior officer.[1]

The Director also has unreviewable authority to insti-
tute *inter partes* review.  35 U.S.C. § 314(a), (d).  *Cf. Free
Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S.
477, 504 (2010) (discussing the importance of the ability to
"start, stop, or alter individual [PCAOB] investigations,"
even where the reviewing principal officer already had sig-
nificant "power over [PCAOB] activities").  Though the *Ar-
threx* panel did not address the Director's ability to
reconsider an institution decision, our precedent holds that
the Board[2] may reconsider and reverse its initial institu-
tion decision.  *See, e.g.*, *Medtronic, Inc. v. Robert Bosch
Healthcare Sys., Inc.*, 839 F.3d 1382, 1385−86 (Fed. Cir.
2016) (explaining that "§ 318(a) contemplates that a pro-
ceeding can be 'dismissed' after it is instituted, and, as our
prior cases have held, administrative agencies possess

---

[1]    To be sure, I do not mean to suggest that the Direc-
tor's extensive powers of supervision mean that he can dic-
tate the outcome of a specific *inter partes* proceeding.
Rather, his ability to issue guidance and designate prece-
dential opinions provides the general type of supervision
and control over APJs' decision-making that renders them
inferior, not principal, officers.

[2]    The Director's delegation of his institution power to
the Board does not diminish its existence.  37 C.F.R.
§ 42.4(a) (stating that "[t]he Board institutes the trial on
behalf of the Director").  *See also Ethicon Endo-Surgery,
Inc. v. Covidien LP*, 812 F.3d 1023, 1033 (Fed. Cir. 2016).

inherent authority to reconsider their decisions, subject to certain limitations, regardless of whether they possess explicit statutory authority to do so" (internal quotation and citation omitted)).

The Director also controls which APJs will hear any given instituted *inter partes* review. 35 U.S.C. § 6(c). In my view, this power of panel designation is a quintessential method of directing and controlling a subordinate. Importantly, I do not believe that in stating that the power to remove an officer at-will from federal employment is "a powerful tool for control of an inferior," *Free Enterprise*, 561 U.S. at 510 (internal quotation omitted), the Supreme Court meant that such removal power is the only effective form of control in the context of the Appointments Clause. For example, the Judge Advocate General in *Edmond* could remove the Court of Criminal Appeal judges from judicial service without cause, but not necessarily federal employment altogether. *Edmond*, 520 U.S. at 664. *See also Free Enterprise*, 561 U.S. at 510 (relying on both at-will removal authority and "the [SEC's] other oversight authority" in finding with "no hesitation" that the PCAOB members are inferior officers). That is akin to the Director's authority to designate which APJs will consider a certain case. And despite acknowledging that "when a statute is silent on removal, the power of removal is presumptively incident to the power of appointment[,]" the *Arthrex* panel declined to opine on the Director's ability to de-designate APJs from a panel under § 6(c). *Arthrex*, 941 F.3d at 1332. But *Edmond* referenced the ability to remove the judges there "from [their] judicial assignment[s]," followed by a recognition of the potent power of removal. 520 U.S. at 664. If the Director's ability to control APJs plays a significant part in the unconstitutionality at issue, such that the remedy is to make APJs removable at will, the panel should have definitively addressed the Director's de-designation authority. Moreover, as outlined in Section I C, *infra*, APJs already may be disciplined or removed from federal employment

under the routine efficiency of the service standard, which is not incompatible with discipline or removal for failing to follow the Director's binding guidance.

And the Director may continue to provide substantial direction and supervision after the Board issues its final written decision. As *Arthrex* recognizes, the Director may convene a Precedential Opinion Panel (POP), of which the Director is a member, to consider whether to designate a decision as precedential. *Arthrex*, 941 F.3d at 1330. But I read the Standard Operating Procedures more broadly, such that the Director may also make a precedential designation or de-designation decision single-handedly,[3] thereby unilaterally establishing binding agency authority on important constitutional questions and other exceptionally important issues. Standard Operating Procedure 2, at 3−4. Indeed, it appears that the Director has done so in at least sixteen cases in 2018 and 2019. *See* USPTO, *Patent Trial and Appeal Board Precedential and informative decisions*, *available at* https://www.uspto.gov/patents-application-process/patent-trial-and-appeal-board/precedential-informative-decisions (listing decisions designated as precedential in the past year, where some are labeled as "Precedential Opinion Panel decision" and others are not). The Director may also convene a POP of his choice, of which he

---

[3]   "No decision will be designated or de-designated as precedential or informative without the approval of the Director. This SOP does not limit the authority of the Director to designate or de-designate decisions as precedential or informative, or to convene a Precedential Opinion Panel to review a matter, in his or her sole discretion without regard to the procedures set forth herein." Patent Trial and Appeal Board, Standard Operating Procedure 2 (Revision 10) at 1 (Standard Operating Procedure 2), *available at* https://www.uspto.gov/sites/default/files/documents/SOP2%20R10%20FINAL.pdf.

is by default a member, to consider whether to rehear and reverse any opinion. Standard Operating Procedure 2, at 4. And, the Director may "determine that a panel of more than three members is appropriate" and then choose those additional members as well. *Id.* Though the *Arthrex* panel recognized these powers, it dismissed them because the Director has only one vote out of at least three. 941 F.3d at 1331−32. This assessment, however, misses the practical influence the Director wields with the power to hand-pick a panel, particularly when the Director sits on that panel. The Director's ability to unilaterally designate or de-designate a decision as precedential and to convene a POP of the size and composition of his choosing are important tools for the direction and supervision of the Board even after it issues a final written decision.[4]

---

[4]     The underestimation of the Director's power is particularly evident in light of this court's prior *en banc* decision in *In re Alappat*, 33 F.3d 1526 (Fed. Cir. 1994), *abrogated on other grounds by In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008). *Alappat* contained strong language about the ability to control the composition and size of panels. *See, e.g.*, *id.* at 1535 (noting that "the Board is merely the highest level of the Examining Corps, and like all other members of the Examining Corps, the Board operates subject to the Commissioner's overall ultimate authority and responsibility"). While the duties of the Board and the Director have changed since *Alappat* was decided, the authority to determine the Board's composition for reconsideration of an examiner's patentability determination mirrors the current authority with respect to *inter partes* review. *Compare* 35 U.S.C. § 6(c) (2012) (giving the Director authority to designate "at least 3 members of the Patent Trial and Appeal Board" to review "[e]ach appeal, derivation proceeding, post-grant review, and inter partes review"), *with* 35 U.S.C. § 7(b) (1988) (giving the

8                    ARTHREX, INC. v. SMITH & NEPHEW, INC.

    Combined, all of these powers provide the Director con-stitutionally significant means of direction and supervision over APJs—making them inferior officers under the rule of *Edmond*.

B

    Despite the Director's significant powers of direction and supervision, the *Arthrex* panel concluded that APJs are principal officers in large part because no principal officer may "single-handedly review, nullify or reverse" the Board's decisions. *Arthrex*, 941 F.3d at 1329. But Supreme Court precedent does not require such power. And in the cases in which the Court emphasized a principal officer's power of review, that principal officer had less authority to direct and supervise an inferior officer's work ex ante than the Director has here.

    In *Edmond*, for instance, the Court of Appeals for the Armed Forces, an Article I court, could review decisions of the Court of Criminal Appeals judges at issue. However, its scope of review was limited. *Edmond*, 520 U.S. at 665 (explaining that the Court of Appeals for the Armed Forces may only reevaluate the facts when there is no "competent evidence in the record to establish each element of the of-fense beyond a reasonable doubt"). And while the Judge Advocate General "exercise[d] administrative oversight" and could "prescribe uniform rules of procedure," he could "not attempt to influence (by threat of removal or other-wise) the outcome of individual proceedings." *Id.* at 664. Nonetheless, the Supreme Court found that the Court of

---

Commissioner power to designate "at least three members of the Board of Appeals and Interferences" to review "ad-verse decisions of examiners upon applications for pa-tents"). Therefore, I believe the panel should have at least discussed how *Alappat*'s view of the power to control the Board might impact the Appointments Clause analysis.

Criminal Appeals judges were inferior, not principal, officers. In comparison, while the Director may not unilaterally decide to rehear or reverse a Board decision, he has many powers to direct and supervise APJs both ex ante and ex post, Section I A, *supra*, that no principal officer had in *Edmond*.

Similarly, in *Freytag v. Comm'r*, 501 U.S. 868 (1991), the Supreme Court considered the status of special trial judges appointed by the Tax Court, whose independent decision-making varied based on the type of case before them. The Court held that the special trial judges were inferior officers—not employees—when presiding over "declaratory judgment proceedings and limited-amount tax cases" because they "render[ed] the decisions of the Tax Court" in those cases. *Id.* at 882. In doing so, the Court distinguished between cases in which the special trial judges acted as "inferior officers who exercise independent authority," and cases in which they still had significant discretion but less independent authority. *Id.* The Court's analysis distinguished between inferior officer and employee; nowhere did the Court suggest that special trial judges' "independent authority" to decide declaratory judgment proceedings and limited-amount cases rendered them principal officers. *See id.* at 881−82. Most recently, the Court applied the framework of *Freytag* in deciding whether administrative law judges (ALJs) of the Securities and Exchange Commission (SEC) are inferior officers or employees. *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2053 (2018). The Court reasoned that SEC ALJs and *Freytag*'s special trial judges are extremely similar, but SEC ALJs arguably wield more power because their decisions become final if the SEC declines review. *Id.* at 2053−54. But again, the Court found this structure still only rendered SEC ALJs officers, not employees. *Id.* at 2054. No mention was made

of SEC ALJs being principal officers.[5]  *See id.* at 2051 n.3 (explaining that the distinction between principal and inferior officers was "not at issue here").  Just as the special trial judges in *Freytag* and the SEC ALJs in *Lucia* were inferior officers, so too are APJs.

Nor does this court's precedent require unfettered review as a marker of inferior officer status.  In *Masias v. Sec'y of Health & Human Servs.*, we rebuffed the argument that because the Court of Federal Claims does not review decisions of the Vaccine Program's special masters de novo, the special masters are principal officers.  634 F.3d 1283, 1293−94 (Fed. Cir. 2011).  There, we recognized that the Court of Federal Claims may only "set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  *Id.* at 1294.  This limited review means that many of the special masters' decisions are effectively final because the Court of Federal Claims has no basis to set aside findings of fact or conclusions of law.  We reasoned that such limited review of special masters' decisions by the Court of Federal Claims resembled the review in *Edmond*, and that "the fact that the review is limited does not mandate that special masters are necessarily 'principal officers.'"  *Id.* at 1295.

Finally, the panel analogized the *Arthrex* issue to the one addressed by the D.C. Circuit in *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012).  *See Arthrex*, 941 F.3d at 1334.  But the facts of

---

[5]    In fact, the Court declined "to elaborate on *Buckley*'s 'significant authority' test" marking the line between officer and employee, citing two parties' briefs which argued that the test between officer and employee, not principal and inferior officer, should include some measure of the finality of decision making.  *Lucia*, 138 S. Ct. at 2051−52.

*Intercollegiate* are significantly different than those in *Arthrex*. The Librarian of Congress—the principal officer who supervises the Copyright Royalty Judges (CRJs) at issue—was much more constrained in her ability to direct and supervise the CRJs than the Director. The governing statute grants CRJs broad discretion over ratemaking. *See* 17 U.S.C. § 802(f)(1)(A)(i) (stating that "[CRJs] shall have full independence in making" numerous copyright rate-related decisions). The Librarian "approv[es] the CRJs' procedural regulations, . . . issu[es] ethical rules for the CRJs, [and] . . . oversee[s] various logistical aspects of their duties," such as publishing CRJs' decisions and providing administrative resources. *Intercollegiate*, 684 F.3d at 1338. In fact, it appears the only way the Librarian can exercise substantive control over the CRJs' ratemaking decisions is indirectly through the Register of Copyrights, whom she, not the President, appoints. *See* 17 U.S.C. § 701(a). The Register corrects any legal errors in the CRJs' ratemaking decisions, 17 U.S.C. § 802(f)(1)(D), and provides written opinions to the CRJs on "novel question[s] of law," 17 U.S.C. § 802(f)(1)(B), or when the CRJ requests such an opinion. 17 U.S.C. § 802(f)(1)(A)(ii). But the CRJs may not consult with the Register about a question of fact. 17 U.S.C. § 802(f)(1)(A)(i). The Librarian therefore exerts far less control over CRJs than the Director can over APJs using all the powers of direction and supervision discussed in Section I A, *supra*.

The comparison to *Intercollegiate* in *Arthrex* again highlights how the unique powers of direction and supervision in each case should be viewed in totality, rather than as discrete categories weighing in favor of inferior officer status or not. In particular, breaking up the analysis into three discrete categories—Review, Supervision, and Removal—overlooks how the powers in each category impact each other. Again, for example, whereas ex post the Court of Appeals for the Armed Forces has more power to review the Court of Criminal Appeals judges' decisions than the

Director has to review a Board decision, neither the JAG nor the Court of Appeals for the Armed Forces have the Director's ex ante control, such as the power to decide whether to hear a case at all or to issue binding guidance on how to apply the law in a case. Viewed through this integrated lens, I believe APJs comfortably fit with prior Supreme Court precedent that has never found a principal officer in a challenged position to date.

C

Finally, Title 5's efficiency of the service standard does not limit the ability to discipline or remove APJs in a constitutionally significant manner. It allows discipline and removal for "misconduct [that] is likely to have an adverse impact on the agency's performance of its functions." *See Brown v. Dep't of the Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000). To be sure, the efficiency of the service standard does not allow discipline or removal of APJs "without cause," as in *Edmond. See Arthrex*, 941 F.3d at 1333. But neither the Supreme Court nor this court has required that a civil servant be removable at will to qualify as an inferior officer. To the contrary, the Supreme Court and this court have upheld for-cause removal limitations on inferior officers. *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 692–93 (1988) (holding that the "good cause" restriction on removal of the independent counsel, an inferior officer, is permissible); *Masias*, 634 F.3d at 1294 (stating that the Court of Federal Claims can remove special masters for "incompetency, misconduct, or neglect of duty or for physical or mental disability or for other good cause shown"). *See also Free Enterprise*, 561 U.S. at 494 (explaining that the Court previously "adopted verbatim the reasoning of the Court of Claims, which had held that when Congress ' "vests the appointment of inferior officers in the heads of Departments[,] it may limit and restrict the power of removal as it deems best for the public interest' " " (alteration in original) (quoting *United States v. Perkins*, 116 U.S. 483, 485

(1886) (itself quoting *Perkins v. United States*, 20 Ct. Cl. 438, 444 (1885)))).

The efficiency of the service standard allows supervisors to discipline and terminate employees for arguably an even wider range of reasons than the standards above. Failing or refusing to follow the Director's policy or legal guidance is one such reason. Together with the significant authority the Director wields in directing and supervising APJs' work, the ability to remove an APJ on any grounds that promote the efficiency of the service supports finding that APJs are inferior officers.

## II

Assuming for the sake of argument that APJs are principal officers, the present appointment scheme requires a remedy. The *Arthrex* fix makes APJs removable at will by partially severing 35 U.S.C. § 3(c) as it applies Title 5's removal protections to APJs. *Arthrex*, 941 F.3d at 1337–38. Though the key question in a severance analysis is congressional intent, *Arthrex* disposed of the question in a few sentences. I believe a fulsome severance analysis should have considered Congress's intent in establishing *inter partes* review against the backdrop of over thirty years of employment protections for APJs and their predecessors. And doing so would have revealed the importance of removal protections for APJs, particularly in light of Congress's desire for fairness and transparency in the patent system.

Our touchstone must remain the intent of Congress. *See United States v. Booker*, 543 U.S. 220, 246 (2005). As I outlined in my concurrence in *Polaris Innovations Ltd. v. Kingston Tech. Co.*, 792 F. App'x 820, 828–31 (Fed. Cir. 2020), the long-standing employment protections provided to APJs leads me to believe that Congress intended for them to have removal protections, regardless of changes made to the Board in the AIA. Given this history, it seems unlikely to me that Congress, faced with this Appointments Clause problem, would have chosen to strip APJs of

14                    ARTHREX, INC. v. SMITH & NEPHEW, INC.

their employment protections, rather than choose some other alternative.

I recognize that the panel considered several potential fixes and chose the one it viewed both as constitutional and minimally disruptive.   But removing long-standing employment protections from hundreds of APJs is quite disruptive.   It paradoxically imposes the looming prospect of removal without cause on the arbiters of a process which Congress intended to help implement a "clearer, fairer, more transparent, and more objective" patent system.   *See, e.g.*, America Invents Act, 157 Cong. Rec. S5319 (daily ed. Sept. 6, 2011) (statement of Sen. Kyl).

Given no clear evidence that Congress would have intended such a drastic change, I would defer to Congress to fix the problem.   I agree with Judge Dyk that Congress "would prefer the opportunity to itself fix any Appointments Clause problem before imposing the panel's drastic remedy." Dyk Op. at 6.  Congress can best weigh the need for a fair and transparent patent system with the need for federal employment protections for those entrusted with carrying out that system.   And Congress faces fewer constraints than we do in fixing an unconstitutional statute. We should allow it to do so.

# United States Court of Appeals
# for the Federal Circuit

---

**ARTHREX, INC.,**
*Appellant*

**v.**

**SMITH & NEPHEW, INC., ARTHROCARE CORP.,**
*Appellees*

**UNITED STATES,**
*Intervenor*

---

2018-2140

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2017-00275.

---

WALLACH, *Circuit Judge*, dissenting from denial of a petition for rehearing *en banc*.

I write to express my disagreement with the merits of the decision in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019). Given the significant direction to and supervision of an administrative patent judge ("APJ") of the U.S. Patent and Trademark Office's ("USPTO") Patent Trial and Appeal Board ("PTAB") by the USPTO Director, an APJ constitutes an inferior officer properly appointed by the Secretary of Commerce. Specifically, the Director's ability to select a panel's members, to

designate a panel's decision as precedential, and to de-designate precedential opinions gives the Director significant authority over the APJs and preserves the political accountability of the USPTO. This framework strongly supports the contention that APJs are inferior officers. I respectfully disagree with the *Arthrex* decision.

The Supreme Court explained that it "ha[s] not set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointment Clause purposes[,]" *Edmond v. United States*, 520 U.S. 651, 661 (1997), but that it is "evident that 'inferior officers' are officers whose work *is directed and supervised* at some level by others who were appointed by presidential nomination with the advice and consent of the Senate[,]" *id.* at 663 (emphasis added). The inquiry is context specific; the Supreme Court has sought to determine whether a principal officer "exercises administrative oversight over" another, by examining, for instance, whether a principal officer "is charged with the responsibility to prescribe uniform rules of procedure," "formulate[s] policies and procedure[s] in regard to review of" the officer's work, and may remove the officer without cause. *Id.* at 664 (internal quotation marks omitted). The oversight need not be "plenary," *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 504 (2010), and the officer's actions may be "significant" and done "largely independently" of the principal officer, *id.* at 504. *Edmond* instructs that the Appointments Clause is "designed to preserve political accountability relative to important Government assignments[.]" 520 U.S. at 663. The current framework for appointing, directing and supervising, and removing APJs preserves political accountability of the important work done at the USPTO.

The Director has broad authority to direct and supervise the APJs; this includes removal powers, *see* 35 U.S.C § 3(c), and supervision responsibilities, such as the promulgation of regulations, *id.* § 2(b), including those governing inter partes review, *id.* § 316(a)(4), and establishing

USPTO policy, *id.* §§ 3(a), 6. In particular, there are specific ways the Director may direct and supervise the APJs and effectively determine the outcome of their work. First, the Director has the ability to select APJ panel members and designate which panel decisions are precedential. Specifically, the Director controls which APJ will hear any given appeal, proceeding, or review. *See id.* § 6(c) ("Each appeal, derivation proceeding, post-grant review, and inter partes review shall be heard by at least [three] members of the [PTAB], who shall be designated *by the Director*." (emphasis added)). Accordingly, the Director holds the authority to select which APJ will be on a panel and is free to exclude an APJ from a panel for any reason. I see this as overwhelming support for the proposition that APJs are inferior officers.

Second, the Director possesses an additional supervisory tool in exercising his or her statutory authority to form a standing Precedential Opinion Panel of at least three PTAB members who can rehear and reverse any PTAB decision. *See* Patent Trial and Appeal Board Standard Operating Procedure 2 at 2–4 https://www.uspto.gov/sites/default/files/documents/SOP2%20R10%20FINAL.pdf. The Precedential Opinion Panel's opinion is precedential and binds all future panels of the PTAB. *Id.* at 3. The Director selects the members of the Precedential Opinion Panel and, by default, serves as a member of the panel as well. *Id.* at 4. The ability to select is the ability to direct. Moreover, the Director has the authority to de-designate precedential opinions as she or he sees fit. *Id.* at 12. These tools certainly preserve political accountability at the USPTO. Even though the *Arthrex* panel focused on the Director's authority—or lack thereof—over APJs as an essential building block in its analysis, the panel failed to give adequate weight to these compelling features of the Director's authority.

Other indicia support the view that APJs are inferior officers, but I view panel selection and precedential

4                    ARTHREX, INC. v. SMITH & NEPHEW, INC.

determinations as key, and noticeably absent from the discussion in *Arthrex*.  Accordingly, I respectfully disagree with the *Arthrex* decision.